## De Groot vs. Van Duzer.

Where a *banking company*, incorporated in another state, kept an office in the city of New-York for the purpose of discounting notes and issuing bills to be put in circulation as money, and the president of such company entered into an agreement with a *broker* of New-York to receive of him all notes of the banking company which he should procure in his business as a broker, and pay him the amount thereof in cash, deducting a discount of one-eighth of one per cent., IT WAS HELD, on *demurrer* to pleas alleging those facts and *averring* that the agreement was entered into to *aid* the banking company in the above operations, and that by means thereof, and the acts of the plaintiff under the agreement, the banking company was the better enabled to carry on its operations and business of discounting and issuing notes at their office in the city of New-York, that the agreement was *void*, as made with the design to violate the provisions of the statute of this state forbidding all associations (unless expressly authorized so to do) to keep an office within this state,  for the purpose of discounting notes, or issuing bills to be loaned or put in circulation as money.*

ERROR from the supreme court. This was an action of *assumpsit*, brought in the superior court of law of the city of New-York by *Van Duzer* against *De Groot*. The plaintiff declared that he being a *stock* and *exchange broker* in the city of New-York, and in the daily habit of purchasing the notes of the *Washington Banking Company*, an agreement was entered into between him and the defendant, whereby, in consideration that he would deliver to the defendant such notes of the Washington Banking Company as he should from time to time procure in his business, to be put up in envelopes, and deposited on *Wednesday* and *Saturday* of each week at the office of a Mr. *Solomons*, in Wall-street; and also, in consideration that he

---

* *Senator* VERPLANCK, in the dissenting opinion delivered by him, holds the agreement to be *valid*, as it is not averred that the plaintiff was a *guilty* participator in the transaction, as far as the violation of the law is concerned, or that he had even deviated from the ordinary course of his business in consequence of the agreement ; that his general knowledge, that the arrangement would indirectly *aid* the banking company, did not vitiate the agreement, as he might well be deemed to have had no other intention than to give a general currency to the bills of the bank, and not to aid in the infraction of the law, by the issuing of bills within this state.

De Groot' *v.* Van Duzer.

agreed to allow to the defendant a *discount* upon such notes, at and after the rate of *one eighth of one per cent* upon the amount so to be procured and deposited, *the defendant promised to receive and discount such notes so procured and deposited, and to pay to him the full amount thereof.* The plaintiff then avers, that in the course of his business, he purchased and procured a large amount of such notes, to wit, the sum of $1733; that he put up the same in an envelope in the manner agreed upon, and on *Saturday*, the 28th December, 1833, deposited the same in the office of Mr. Solomons; that he hath always been willing to accept the amount ,of such notes so deposited, deducting the *one eighth of one per cent.*, but that the defendant would not receive and discount the notes. There was another count similar to the above.

The defendant pleaded the *general issue*, and *specially*, that at the time of the agreement, the *Washington Banking Company*, of which the defendant was *president*, being a foı eign body corporate, created by the legislature of New-Jersey, *kept an office in Wall-street*, in which one *J. E. Solomons* acted for them as their agent, for the purpose of discounting notes, checks and bills, and issuing the promissory notes called bank notes of the Washington Banking Company, and other promissory notes and evidences of debt to be put in circulation as money, to wit, at the city of New-York, *the said company not being authorized by law so to do*, and that on, &c. at, &c. it was *against the form and effect, true intent and meaning of the statute*, in such case made and provided, agreed, by and between the plaintiff and the *defendant, so being president as aforesaid, on behalf and for the benefit of the said body corporate*, that, &c., (setting forth substantially the agreement as alleged in the declaration, and then proceeding as follows :) which said agreement was then and there entered into by and between the said plaintiff and the said defendant, so being *president* as aforesaid, and *for the benefit of the said Washington Banking Company*, the *better to enable them to carry on their operations and business of discounting and issuing bank notes as aforesaid, at their said office in Wall-street*, against the form and effect, true intent and meaning of the sta-

tute in such case made and provided ; that the defendant, in pursuance of the *said unlawful agreement*, was in the habit of sending notes of the company to the office in Wall-street, *to be there discounted by them as aforesaid*, and the same when so sent were *discounted for him* in the manner above stated, against the form, &c. of the statute : *by means whereof, the Washington Banking Company were the better enabled to carry on their said operations and business of discounting and issuing notes as aforesaid at their office in Wall-street*, against the form, &c. of the statute—of all which the plaintiff had notice ; and that the notes of the Washington Banking Company, mentioned in the declaration, were left under the said agreement at the office in Wall-street kept by the company ; and this, &c. wherefore, &c. There were two other pleas similar to the above.

The defendant also pleaded that the notes of the *Washington Banking Company* in the declaration mentioned, left at the office of the company in Wall-street, *were received by the plaintiff in payment and in the course of his business as a broker in the city of New-York* ; that a large portion of them were *under the denomination of five dollars* ; that such notes were issued by the said company, *not being authorized to issue the same by any of the laws and statutes of the state of New-York:* by means whereof, the agreement between the parties is void ; and this, &c. wherefore, &c. There were three other pleas similar to the last. The plaintiff *demurred* to all the special pleas, and the demurrers were sustained by the court.

The cause went to trial on the general issue ; and after the evidence was closed, the presiding judge, in his charge to the jury, commenting upon the testimony, very decidedly expressed his opinion, that the defendant contracted with the plaintiff in his *individual capacity*, and not as the agent of the *Washington Banking Company* ; closing his remarks, however, with the observation, that " if the jury viewed the testimony of *Homan* (a witness in the cause) in the light he had stated, the plaintiff was entitled to their verdict." The jury found for the plaintiff. Judgment having been entered for the plaintiff, a writ of error

De Groot *v.* Van Duzer.

was sued out by the defendant removing the record into the supreme court, where the judgment was *affirmed. See the opinion delivered in that court,* 17 *Wendell,* 172, *et seq.* The defendant then removed the record into this court, where the cause was argued by

*F. B. Cutting & G. Wood,* for the plaintiff in error.

*B. F. Butler,* for the defendant in error.

After advisement, the following opinions were delivered.

By the CHANCELLOR. The first question which presents itself for our consideration in this case, is the validity of the defence set up in what has been denominated the first class of special pleas, or the second, third and fourth pleas to the plaintiff's declaration. These pleas profess to be founded upon a well settled principle of law, that no court of justice will lend its aid to enforce the performance of any contract or agreement which is contrary to public policy or good morals, or in contravention of the laws of the state; and the question is, whether the contract between the parties in this case, as the same is stated in these special pleas, comes within that principle. The question is not whether such a defence is conscientious as between the parties, where perhaps the defendant has been himself more culpable than the plaintiff who is endeavoring to enforce the contract against him; for, in the language of Lord Mansfield, it is not for the sake of the defendant that the objection is ever allowed in such cases, but it is upon general principles of policy that courts will not lend their aid to any one who founds his claim or cause of action upon either an immoral or an illegal act. Thus in the case of *Girardy* v. *Richardson,* 1 *Esp. R.* 13, the plaintiff, who rented his house to the defendant for the purpose of the better enabling the latter to carry on an illegal and immoral business there, was certainly far less culpable than the defendant, both legally and morally; and yet, upon this principle of public policy, he was not permitted to recover for the rent.

The substance of the pleas under consideration is, that the Washington Banking Company of New-Jersey, a foreign corporation, in defiance of the prohibition of the statute and in violation of our laws, kept an office in Wall-street, in the city of New-York, for the purpose of discounting notes, checks and bills, *and of issuing bank notes of that bank to be put in circulation as money in this state;* that De Groot, the defendant, being the president of that bank, made the agreement declared on in this case, with the plaintiff, who was a broker in New-York, to receive or purchase the bills of the bank, and that such bills should be redeemed from the plaintiff, semi-weekly, at the trifling discount of one-eighth of one per cent ; and that such agreement was entered into for the benefit of such foreign corporation, the better to enable it to carry on its said operations and business of discounting, and of issuing bank notes at its office in New-York, contrary to the statute.    These pleas contain also another averment, which I consider, however, as not very material in the decision of this case, that in pursuance of the agreement the bills and notes of this foreign corporation, which were subsequently received by the plaintiff, were sent by him from time to time to such office in Wall-street, and were there discounted by the corporation, contrary to the provisions of the statute, whereby the corporation was the better enabled to carry on its illegal operations and business of discounting and issuing bills and notes at such office.    It will be recollected that the question here is not whether the bills for which this suit is brought were received under such circum-stances that the bank itself would not be liable for their redemption, so as to render it material to ascertain whether these particular bills had been illegally issued at the Wall-street office in New-York, or at the mother bank at Hackensack ; but the plaintiff is seeking to recover of a third person, who is not liable for the payment of the bills issued at either place, except so far as he is bound by this special agreement, which, as appears by the pleas, was entered into for the purpose of better enabling the corporation to carry on the illegal business of discounting notes, and issuing bills at the office in Wall-street, in violation of our

De Groot *v.* Van Duzer.

laws.   As the aid to be given to the illegal business carried on in Wall-street, was unquestionably by giving a certain degree of credit and currency to the bills of the institution which were to be issued at that office, this could be done as effectually by redeeming the bills of the bank generally, as by redeeming those only which had been illegally issued.   If the special agreement, therefore, would be void as to any bills issued at the office in Wall-street, it was equally so as to bills issued at the mother bank, and received under the same agreement; which in its terms extended to all bills of the bank, wherever issued.

These pleas then present the question, whether a plaintiff who agrees to do something for the purpose of aiding another to do an illegal act, or in the language of these pleas, for the purpose of the better enabling him to do that act, can sustain an action on that agreement to recover the compensation which the other party has agreed to make as an equivalent therefor. If the plaintiff is right in supposing the defendant meant to contract for himself absolutely, and not as the mere agent of the bank, the personal responsibility of the defendant is a part of the equivalent which the plaintiff was to receive for the aid furnished the bank in its illegal operations in Wall-street, by thus giving currency to its bills.   The court below say it is not shown how the redeeming of the bills under this agreement could aid the illegal operations at the office in Wall-street; but as the plaintiff, by his demurrer, has deprived the defendant of the power of showing how it could aid those operations, this allegation in the plea must be taken as true, unless the court see that it is impossible that it could have had that effect; and then I admit the allegation must be rejected as idle and false.   I think, however, any one who is much acquainted with the operations of Wall-street will readily comprehend how the redemption of bills there, at a trifling discount, will aid those who are putting such bills in circulation as money, at an office in the city, in lending them the more readily to those who wish to borrow in the ordinary course of banking business.   I believe most banks have found, that a much better circulation is given to their bills

De Groot v. Van Duzer.

if they are kept but a little below par in the city of New-York, than if they suffer them to be at a larger discount there. The employment of brokers, therefore, to buy up the bills at a trifling discount, will the better enable the bank to lend its bills and keep them in circulation, whether they are lent at the mother bank or at an unauthorized discount office in Wall-street. The presenting of the bills for payment at the office in Wall-street at stated periods, would also materially aid the bank in keeping up the operations of that office, as it would save the necessity of keeping any very large amount of funds at the mother bank, and would enable the agent at the office in Wall-street, in a case of emergency, to raise the wind upon the discounted paper in his possession, on a very short notice, if an unexpected amount of the bills of the institution was sent in for redemption. I do not think, therefore, we are justified in saying that this averment in these pleas is one which it was impossible should be true; and if it was not, the defendant should not have been deprived of the power of proving it, by the allowance of the demurrers to the three first special pleas. .

There are undoubtedly many conflicting decisions upon the question how far the vendor of an article is chargeable with a participation in the illegal purpose for which it is intended to be used, from a mere knowledge of the fact that the purchaser intends so to use it. The case of the druggist who sold drugs to a brewer, knowing that he intended to use them in his brewing, contrary to statute, is a very strong case in favor of extending the principle to a collateral contract, which had no necessary connection with the violation of the law. That case shows, too, that where the agreement is made for the purpose of aiding in a violation of the law, it is not necessary to aver and prove that the offence was in fact consummated by an actual violation subsequent to the agreement; which agreement is void from the beginning. *Langdon* v. *Hughes*, 1 *Maule & Sel.* 593. If a trader agrees to furnish a robber with arms and ammunition, for the purpose of carrying on his business of a highwayman, it cannot be a valid answer to the illegality of the contract, that the

De Greot v. Van Duzer.

arms and ammunition sold to him for that purpose, were not in fact used in the prosecution of the illegal object originally intended at the time of the purchase. The illegality of the contract consists in the intention to aid in a violation of the law, or of a principle of public policy, or to commit a breach of good morals, and not in the actual consummation of the offence. Those cases in which an independent contract has been held void from a mere knowledge of the fact of the illegal end in view, proceed upon the ground that the party having such knowledge intended to aid the illegal object at the time he made the contract ; and wherever, therefore, that intention is shown, no doubt can exist as to the propriety of applying the rule that no action or claim can be sustained, in a court of justice, founded upon such contract. Here it is distinctly averred, and the fact is admitted by the demurrer, that the object of the agreement between De Groot and Van Duzer was the better to enable the bank to carry on its illegal business at its office in Wall-street ; and if so, an action cannot be sustained by either party on that contract, unless this court is disposed to depart from a most salutary rule of law. Neither do I think this case comes within that class of cases in which the contract, whereon the plaintiff sought to recover, had no immediate connection with the illegal act ; for, as I have before observed, a part at least of the consideration for the defendant's promise was the aid the plaintiff was to furnish the corporation in its illegal operations, by giving currency to its bills in the city of New-York ; by which, in the language of the pleas, it was the better enabled to carry on that business.

Whether it was wise or unwise in the legislature to endeavor to secure to the citizens of this state a safe paper currency of known value, by prohibiting the issuing of any bills or of carrying on any banking operations here except such as are authorized by our own laws, is a question with which, as a court, we have nothing to do. But it is the duty of courts to endeavor to carry into effect the declared will of the legislature, by adhering to those salutary principles which the wisdom of ages has found necessary and proper to compel a due observance of the laws ;

*De Groot v.* Van Duzer.

and by which principles it is made the interest as well as the duty of every individual to abstain from any attempt to defeat the operation of the laws, either directly or indirectly. For these reasons, I think the three first special pleas in this case were well pleaded, and that the demurrer should have been overruled; or in other words, that judgment should have been given thereon for the defendant.

There is a defect in the second class of pleas, in not averring that the agreement to redeem the bills of the bank which should be taken by the plaintiff from time to time, *included bills of a denomination less than five dollars*, as well as the larger bills. As it stands, it does not appear that at the time of making the agreement the bank had ever issued any bills under five dollars. For aught that appears in those pleas, the small bills which were contained in the package had been issued subsequently to the agreement, and were placed in the package contrary to the intention of the parties at the time of the agreement. If so, that would of itself only defeat the recovery *pro tanto*. But if it was a part of the original agreement to redeem bills of a denomination less than five dollars, as well as the larger ones, then the whole agreement was void for that reason. I think the demurrers to the four last pleas were well taken.

I am inclined to think the charge of the judge upon the trial was erroneous, in taking from the jury the question *whether the defendant was authorized by the bank* to make the arrangement with the plaintiff, in the character of president of the bank ; and if so the judge necessarily took from the jury the question whether the contract was in fact made by the defendant in his individual capacity, or only in the character of the president of the bank ; for if he was not authorized to contract as agent, it was his individual contract, although in terms made as agent. I think there was sufficient evidence to have authorized the jury to find that he was empowered by the directors originally to make these arrangements to redeem the bills of the bank in New-York, or that they had subsequently sanctioned the same.

Again ; the legislature having in express terms prohibited the officers of our own banks from buying up, at a discount, the bills

De Groot v. Van Duzer.

of their own institutions, I am inclined to think public policy requires that the same principle should be extended to foreign banking companies; and that no action should be permitted to be sustained upon an agreement which is directly repugnant to the settled policy of the state. For these several reasons, but particularly for the first, I feel myself bound to vote for a reversal of the judgment of the court below.

By Senator EDWARDS. The demurrers to the several special pleas are *general* and not special, and consequently every material fact averred in them, is admitted. If, therefore, the facts set forth in any of the pleas demurred to are sufficient to bar the plaintiff's recovery, the demurrer should have been overruled, and the judgment of the supreme court, as to the pleadings of the parties, should be reversed.

The special pleas in this cause, for the sake of brevity, have been arranged by the supreme court in giving their opinion, and by the counsel on the argument, into two classes, and each plea of the first class has been viewed as substantially alike, and involving the same principles, and also each plea of the second class, and the decision of one in each class, a decision of the whole ; and I propose to consider them in the same order.

It is alleged in the first class of pleas, that the agreement on which the plaintiff in this action seeks to recover, was made in violation of the following statute, viz : " No person, association of persons or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposites, or discounting notes or bills, or issuing any evidences of debt to be loaned or put in circulation as money ; nor shall they issue any bill, or promissory notes, or other evidences of debt as private bankers, for the purpose of loaning them or putting them in circulation as money, unless thereto specially authorized by law." 1 R. S. 708, § 6. The first plea of the first class sets forth, that the company kept an office in Wall-street, in the city of New-York, in which John E. Solomons acted for them and on their behalf as their agent, for

the purpose of discounting notes, checks, bills, and issuing pro-
missory notes, commonly called bank notes of the Washington
Banking Company, and other promissory notes and evidences of
debt to be put in circulation as money, &c.    This part of the
plea sets out a case substantially within the provisions of the
act, and the keeping of such an office in my view is virtually a
violation of the statute ; but so far as this part of the plea is
concerned, it does not allege that the keeping of this office was
a part of the agreement under which the defendant was to receive
the bills of the plaintiff.   Is this defect cured by the subsequent
averments of the plea ?  If the averments show an agreement
which was entered into for the purpose of aiding and assisting
the company in the prosecution of the unlawful design for which
the office was kept, the defect is remedied ; for an agreement
designed to *aid* and assist to carry into effect an unlawful
act is as invalid as that which is made to *effect* the very
object, and therefore cannot be enforced by law ; for the
rule " *ex turpi contractu non oritur actio*" is well settled.
*Langton* v. *Hughes*, 1 *Maule & Selw.* 593.    *Briggs* v.
*Lawrence*, 2 *T. R.* 454.    *Pennington* v. *Townsend*, 7 *Wen-
dell*, 281.    *The Bank of the United States* v. *Owen*, 2 *Peters*,
527.    *Thalhimer* v. *Brinkerhoof*, 20 *Johns. R.* 397.    The
question then is, does the plea substantially aver that the plain-
tiff entered into an agreement for the purpose of aiding in the
unlawful business for which the office was kept ?   It avers that
it was agreed by and between the plaintiff and the defendant, so
being president as aforesaid, *on behalf* and *for the benefit of the
company*, that the defendant being such president, should and
would, at the said office in Wall-street, receive from and discount
for the said plaintiff all such notes of the Washington Banking
Company, as the plaintiff, as such broker as aforesaid, shall from
time to time receive at his office, &c.   It is averred, therefore,
that the defendant, being president, acting on behalf and for the
benefit of the company, was to receive from and discount all the
bank notes of the Washington Banking Company, which the
plaintiff, as such broker as aforesaid, should from time to time

De Groot v. Van Duzer.

receive at his office in the city of New-York, &c. As what bro-
ker? as one acting for the company and on their behalf as their
agent. At what office? at the office kept for the purpose. For
what purpose did he as their broker and agent procure and receive
such bills? For the purpose of enabling such company to dis-
count notes, checks, bills, and issuing promissory notes, com-
monly called bank notes of the Washington Banking Company,
and other promissory notes and evidences of debt to be put in
circulation as money. The plea then goes on to allege that the
agreement was made *for the benefit* of the said Washington
Banking Company, *the better to enable them to carry on their
operations* and business of discounting and issuing bank notes as
aforesaid, at their said office in Wall-street. The inference there-
fore is irresistible, that the plea alleges that the agreement was
made for the benefit of the company, the better to enable them
to do an illegal act, and if so made, the court could not properly
aid the plaintiff in seeking his remedy for a violation of it; if it
was not so made, then the agreement was valid. But the plain-
tiff, by his general demurrer, admits it was made, the better to
enable the company to do an unlawful act, as I conceive it. The
test of the validity of the agreement must rest upon the fact,
whether it was to effect such an object or not; this, in my view,
was a proper subject for the jury, and the plaintiff, instead of
demurring and thereby admitting it, should have taken issue upon
it. I am therefore for overruling the demurrer to this class of
pleas.

As to the second class: I am of opinion that these pleas are
radically defective. They contain no averment that the *agree-
ment* was that the defendant should receive bills under the deno-
mination of five dollars. The averment is, that a large portion
of the notes were under the denomination of five dollars; but
there is no averment that such bills were included in the agree-
ment as forming a part of it, or that the defendant was by the
terms of the agreement under any obligation to take them. The
agreement as there set out is, that the defendant was to receive
and discount all such notes of the Washington Banking Com-
pany as should be procured by the plaintiff, which must be taken

to mean such notes as he might legally procure in the course of business under the then existing laws of the state, and not such as the law prohibited the circulation of. The contract should not by implication receive an illegal construction. · When a contract is capable of receiving two constructions, the one legal and the other illegal, it should receive that construction which would·hold it legal. I am of the opinion, therefore, the demurrers as to this class of pleas were well taken, and should be sustained.

The only remaining question appears to be, whether the motion for a new trial for the misdirection of the judge should have been denied. The judge charged the jury that the defendant showed no authority whatever to make the contract on the part of the bank ; that as president merely, he had no such right, and it did not appear that there was any resolution of the bank, or any act of the directors, to authorize it ; that the defendant having thus contracted in terms, which purported to bind him personally ; and showing no authority from the bank (whose agent he now claimed to be) to bind it, he must be considered as contracting with the plaintiff in his own behalf, &c. The judge seemed to labor under the impression that the defendant must have shown a resolution of the board, or some act of the directors, to give him authority to make the contract in question, and that in the absence of such proof, he must be considered as contracting in his own behalf. This, I apprehend, was a misconception on the part of the judge, and under the circumstances of the case, was well calculated to mislead the jury. It was not necessary that a special authority should have been shewn from the company. Corporations, like individuals, are responsible in the manner in which they permit their agents to hold themselves out to the public. *Buckley* v. *The Derby Fishing Company,* 2 *Conn. R.* 252. *Angel on Corp.* 158. If circumstances were shewn, sufficient to raise a reasonable presumption that he was contracting as the president of the bank, and in that behalf as its official agent, it was a proper question for the jury. It was proved by *Solomons,* that Van Duzer knew he was the

agent of the bank, and that he knew the president. That Van Duzer wished to know if he was willing to allow him one per cent to give the bills a circulation, and being answered in the negative, he requested him to speak to the president of the bank, and see if he would not allow it. That Van Duzer's money came to the office addressed to George W. Yule, cashier of the Washington Banking Company, Hackensack, New-Jersey; and he produced more than twenty envelopes that came to him from Van Duzer, with bills enclosed, which went to his account with the bank. *Homan* also concurs with Solomons as to the manner in which the packages were addressed. That they were addressed to the cashier of the bank as well after as before they were redeemed at *Solomons.* All the difference as to the manner of redemption, after the agreement was made with De Groot, seems to be, that they were redeemed at Solomon's office, who was the agent of the bank, and before the agreement Van Duzer either sent or carried them to the bank. Both of these witnesses testify to a variety of circumstances sufficient to raise a rational presumption that De Groot was transacting the business as the agent of the bank, and with their knowledge and approbation, and should therefore have been submitted to the jury, in such manner as to leave the jury freely to exercise their own judgment upon them. Not that the court may not give its opinion as to matters of fact; it has an undoubted right to do so, for the consideration of the jury, but as the jurors are the triors of the facts, such an expression of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments. *Tracy* v. *Swartout,* 10 *Peters' R.* 96. This in my judgment, was not done in the case under consideration, but the court assumed the right of drawing inferences from the facts, and instructing the jury as to those facts. The jurors being the legally constituted judges of the facts proved, no instructions of the court should infringe upon their high prerogative.

The next objection urged for our consideration is, that the exception to the judge's charge was too general. This objection, however, in my judgment, is untenable. The exception appears

De Groot *v.* Van Duzer.

to be sufficiently explicit, for the attention of the judge was particularly called to the main and essential point. The defendant's counsel alleged that it was a contract with the defendant as president of the bank, and in behalf of the bank as its agent; and the judge then in substance charged the jury that the defendant must shew his authority, by saying that it did not appear that there was any resolution of the bank, or any act of the directors, to authorize it; that the defendant having thus contracted in terms, which purported to bind him personally, and having no authority from the bank to bind it, he must be considered as contracting with the plaintiff in his own behalf; leaving the jury plainly to infer that it was necessary there should be a resolution of the bank, or some act of the directors, to authorize him to make the contract as agent, so as to bind the bank; whereas neither was necessary. If, as president, he assumed to act as agent, and these acts were brought home to the knowledge of the directors in the transactions of the business of the bank, and they permitted him to hold himself out to the public as their acting agent, in the management of their affairs, the bank, as it respects third persons, must be held responsible. It is unnecessary to shew a direct authority in such cases. That he was the president of the bank, acting as the general agent of the corporation, negotiating as to their paper, and did not assume or undertake to contract in his individual capacity, together with the other facts and circumstances, proved, was enough to entitle the defendant to the full benefit of the verdict of the jury, to find whether such contract should be considered as a private transaction or not. I am of the opinion a new trial should have been granted, and I am for reversing the judgment on both grounds, with leave to the plaintiff to withdraw his demurrer to the first class of pleas, and amend on payment of costs; but am for sustaining the demurrer to the second class of pleas with costs.

By Senator VERPLANCK. The main question in this case is, as to the correct interpretation and right application of the legal principle expressed in the old law maxim, *ex turpi contractu non oritur actio*; that a contract resting on an illegal or immoral

De Groot *v.* Van Duzer.

consideration, is void. The principle itself is undoubted, and is acknowledged in one form or other, throughout the jurisprudence of the whole civilized world. Yet there is a degree of uncertainty as to its extent and application, and that in relation to cases of very frequent occurrence in the ordinary business of life. On some points there is an apparent contrariety in the decided cases ; and a great deal of doubt, and even contradiction in the elementary books, as well as in the reasoning of learned judges. I have myself, in making up my decision on this case, hesitated a good deal; not indeed as to the equity of the case, but as to the exact rule which should govern as to all transactions of a similar nature. I have therefore thought it proper, in expressing my concurrence with the decision of the supreme court, to state, as briefly as I can, my own views of this doctrine and its limitations, as well as its peculiar application to the case under judgment.

The original grounds and reasons of this doctrine have been clearly stated by Lord Mansfield, in one of the earlier cases on this point; and whenever principles have been stated in full, by that illustrious magistrate, and elucidated by his reasoning, we have in our hands a clue to guide us, *cæca regens vestigia filo*, through any labyrinth of conflicting authorities or inconsistent adjudications. " The objection," says he, " that a contract is illegal, or immoral, as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for *his* sake, however, that this objection is ever allowed; but it is founded on general principles of policy, which the defendant has advantage of, contrary to the real justice between him and the plaintiff, if I may so say. The principle of public policy is this—*ex dolo malo non oritur actio.* No court will lend its aid to a *man who founds his cause of action upon an illegal or immoral act.* If from the plaintiff's own showing, or otherwise, the cause of action appears to arise *ex turpi causa*, or from the transgression of the positive laws of his country, then, the courts say that he has no right to be assisted. It is upon that ground the court goes—not for the sake of the

defendant, but because they will not lend aid to such a plaintiff. So if the parties change sides, and the defendant brings his action against the plaintiff, the latter would have the advantage. Where both are equally in fault, *potior conditio defendentis.*" " The question then is, whether the demand be upon the ground of any immoral act or conduct, or upon the ground of his being guilty of any thing prohibited by law." *Holman* v. *Johnson, Cowper*, 341. Here, it will be seen, the doctrine is made to rest upon the ground of public policy. The contract is made void, because it is founded on an immoral act. And in applying the rule to the person making the demand, the inquiry is whether he has been *guilty* of any thing infringing moral law, or prohibited by positive legislation.

In carrying out and applying these rules, two questions arise—both of them springing out of the broad words of the legal maxim. First, it was doubted how far a court should go, in enforcing subsequent contracts growing out of a past illegal act or agreement, but not immediately forming any essential part of such act or contract : as when the new contract is either between the original guilty parties, or else known to both sides to be indirectly connected with an illegal transaction. The courts sometimes manifested a disposition to set aside all such contracts, and to consider them tainted by the original vice of the prior transaction. But it is now well settled otherwise in the courts of this country, and I doubt not also in England, notwithstanding some varying cases. The English cases are collected and reviewed by Chief Justice Marshall, in *Tolen* v. *Armstrong*, 11 *Wheaton*, 258, and I need not go over them. There the supreme court affirmed the doctrine laid down by Judge Washington, in the circuit court, " that if the new promise be unconnected with the illegal act, and founded on a new consideration, it is *not* tainted, although such illegal act was known to the party to whom the promise was made, and he was the original contriver of it." In deciding that this knowledge of a foregone illegal contract did not vitiate a second contract caused by that transaction, but founded immediately on a new consideration, Chief Justice *Marshall* is much

influenced by the consideration of the opposing public policy, which was the source of the original doctrine. "To connect," says he, " distinct and independent transactions with each other, and infuse into one, perfectly fair and legal in itself, the contaminating matter which infected another, would introduce extreme mischief into the ordinary affairs and transactions o life, not compensated by any accompanying advantage." 1 *Wheat.* 261. In spite, then, of some varying cases and *dictu*, we may consider the law as to such subsequent contracts as being well settled in the manner in which it has been stated by Judge Story, *Conflict of Laws*, 207, that the principle of invalidating contracts, for the illegality or immorality of the consideration, is not to be " extended to new transactions, after the illegal act, though accompanied with knowledge thereof." " Thus, after goods are smuggled, if a new contract is made by the smuggling importer for a sale to the retailer, and by him to a tailor, and again by him to a customer, all these contracts are good, though accompanied by the previous violation of law." The present case, though depending on the same principle, does not fall within this class, but belongs to the second one of the same general nature to which I have above alluded—I mean those where the question is, how far does the plaintiff's knowledge of an illegal object, use or intent of the contract by the other party, but in which he has no direct part, vitiate his right of action ? As, for instance, where a person agrees to sell goods to another whom he has good reason to believe means to violate the revenue laws, or otherwise use the goods illegally. The analogy between these and the previous class of cases is so strong that I could not consider the latter alone; and the reasons and decisions on the one head, have a direct and powerful bearing upon the other.

Guided, then, by this analogy, and looking, first, to the reason of the doctrine, (laying aside, for a moment, all the positive authorities,) we cannot, it seems to me, but arrive at some such conclusions as these : As the refusal to give legal validity to a contract involving an immoral consideration, has in view the pro-

De Groot *v*. Van Duzer.

motion of the great objects of public policy in preventing viola-
tions of law, so, for the same reasons, it ought never to be carried
to such an extent, as (in Chief Justice Marshall's language, just
cited,) "to introduce extensive mischief in the ordinary affairs
and transactions of life, not compensated by any accompanying
advantage." Society is formed for the common advantage of all
who compose it ; and in the mixed and imperfect nature of man,
the immoral and the profligate, as well as the weak and ignorant
transgressors, have still their rights, and must not be shut out
from the benefits and protection of the laws. The law itself, if
wise, must, like the all-wise Father of all law and all wisdom,
shed its blessings "on the evil and the good—the just and the
unjust." It would surely be to carry this doctrine to a "most
inconvenient and dangerous extent, if it were held a crime," as
Lord Mansfield said in *Holman* v. *Johnson*, to sell goods in the
usual course of trade, with the probable knowledge that some
of them may minister to the vices of a licentious person, or be
so used as to cause a transgression of some law of the revenue,
or even of some ordinance of local police. Virtue and vice are
too much mixed up in life to allow of so impracticable a legal
morality; which, after all, would serve much oftener to protect
and assist fraud, than to preserve the authority of the laws. Thus,
it would seem, that public policy could not go further in this
direction, without defeating its own ends, than to refuse to enforce
contracts which went directly and immediately to the violation
of the laws of the land or of public morals. It would defeat its
own ends, if it made void all contracts remotely, indirectly,
consequentially or contingently tending to any such violation—just
as it would do so, if it invalidated contracts growing subsequently
and secondarily from an illegal transaction, but on a new and
meritorious consideration—which, as we have seen, our courts
hold to be valid.

Again : the application of the doctrine to particular individuals
is guided, as it is well laid down in *Holman* v. *Johnson*, *Cowper*,
342, above cited, by the participation in the *guilt* of the transac-
tion. It rests upon "the cause of action arising *ex turpi causa*,
or the party's transgression of his country's laws." He who sells

De Groot *v.* Van Duzer.

any thing, or bargains to do any act, directly and immediately ,in furtherance of an illegal intent, and as its essential and necessary means, it being known to him that such intent is the cause and reason of the bargain, may fairly be concluded as a participator in the guilt. In case of such an immediate knowledge and direct intent to further an illegal object, by providing the means essential to its attainment, he who furnishes such means, as Lord Ellenborough says, in *Langton* v. *Hughes,* 1 *Maule & Selw.* 593, " may be said, *quantum in illo,* to have caused or procured the the illegal act." But we cannot, without a latitude repugnant to every principle of construction of penal law, and even to our own moral sense, extend this notice of guilt to one who knows that in the excercise of a trade, useful and lawful, he supplies that which can be misapplied to vicious ends, or used in a manner forbidden by the policy of the law. To give, therefore, this character of construction, or accessory guilt to a party, it would seem necessary that the act violating the law should be in his direct intention, and not merely known to be a possible or even probable consequence of his contract.

From these considerations, and arguing only upon general principles, I would infer these few rules :

First, that to invalidate a contract, upon the ground of a plaintiff's knowledge that his part of it would aid an immoral or illegal act, the means furnished by him must be such as are directly necessary and essential to such a purpose, and be supplied with the express intent to accomplish that object.

The second rule, the converse of the other, is, that the bare knowledge that the person pursues an illegal trade, or criminal course of life, ought not to vitiate a contract made with him in the ordinary course of business, and not directly and immediately connected with such criminality, although the effect of the contract might be to facilitate such an object.

The conclusions to which I have thus been brought by general reasoning, are confirmed by the best and most numerous authorities, and will at the same time explain and reconcile some of them that must at first strike the reader as contradictory, and

have been so represented in the elementary books. Thus in, *Lightfooot* v. *Tenant*, 1 *Bos. & Pul.* 551, in *Briggs* v. *Lawrence*, 3, *T. R.* 454, *Wagul* v. *Reed*, 5 *T. R.* 591, the courts held that the contract for the sale of goods was void, where it entered directly into it that the same should be smuggled or exported contrary to law, as where they were to be put up in a particular manner, fit only for that purpose, or delivered at a particular place, out of the course of fair trade, so as to leave no doubt of the intention. Again : where drugs are sold by a druggist to a brewer, for the express and sole purpose of being mixed with the liquor, in a manner forbidden by statute, in consideration of the public health though the druggist had no further part in violating the law than selling the drugs for that known purpose, it was held that he sold them " in order to enable the vendee to use them for illegal purposes, and could not recover the price." 1 *Maule & Selw.* 593.

But on the other hand, where articles of dress were sold, as in *Bonny* v. *Bennet*, 1 *Campb.* 348, or where lodgings were let, as in *Cripp* v. *Churchill*, cited in 1 *Bos. & Pul.* 340, or washing, &c. done for prostitutes, as in *Lloyd* v. *Johnson, id.* 341, it was held that the sale of the articles of dress, the *lease* of lodgings, the washing, &c. were general contracts, and " would not be vitiated by knowledge of the probable use to which the articles might be applied ;" *aliter*, when the party expected to be paid from the profits of prostitution. So, again, in *Hodson* v. *Temple*, 1 *Taunt.* 182, where spirits were sold with the knowledge that the buyer was engaged in the double business of distilling and retailing liquors, which two lines of business were forbidden, (probably on account of the policy of the excise laws,) under a penalty to be carried on by the same person, the contract was enforced.     Sir James Mansfield, Ch. J. of the C. B. said, to invalidate it, " would be to carry the law much farther than it had yet been done. The mere selling of goods, knowing that the buyer will make an illegal use of them, is not sufficient to deprive the vendor of his just right of payment. To effect that, it is necessary that the vendor should have a share in the illegal transaction." In that case, the carrying on two trades together,

De Groot *v.* Van Duzer.

either of which was innocent, was the violation of the law, and with this the original seller of the liquor had nothing to do; it had no bearing upon, nor was the inducement to his contract.

To apply these views and rules to the case now under judgment : By a law of this state, it is illegal for a foreign corporation to discount paper and issue notes, or keep an office therefor, within this state. But the business of redeeming and purchasing the paper of foreign banks coming here in the course of trade, is one of great commercial convenience, not prohibited to any private citizen, and expressly allowed by statute to some of our chartered companies. Van Duzer, the plaintiff in the court below, is a broker, engaged in that trade, and had, before the contract, bought or redeemed notes issued by the Washington Banking Company, chartered in New-Jersey, and carrying on business there. The defendant below, De Groot, who is president of that bank, agrees with him to redeem and pay for in New-York, all such notes of that bank as Van Duzer should redeem at certain rates ; on which consideration he undertakes to redeem them. De Groot now pleads that the agreement was for the benefit of the Washington Banking Company, " the better to enable them to issue their paper, and discount notes in the city of New-York," where they illegally kept an office, and actually did so issue notes, of all which Van Duzer had notice. It is not averred that Van Duzer made himself a party to the illegal transaction by drawing his profits or compensation from it, or their being contingent upon it ; nor that he furnished any direct and immediate means of such illegal banking ; as for instance, by deviating from the ordinary course of his business, to give special currency to the notes illegally issued ; or that the illegal business depended directly upon the notes so issued being redeemed in the city of New-York. On the contrary, the plea admits that the defendant agreed to receive from Van Duzer *all* the notes of the company which he might redeem, however issued ; that is, whether in New-Jersey, where they might be legally issued, or in this state. The agreement then, in my judgment, is legal, and cannot be vitiated by the general knowledge that it would, consequentially, " the better enable a third

party to carry on" a business forbidden by law, in which the plaintiff below had no direct concern. His intention was, to give general currency to the paper of the bank, but not specially to aid the infraction of our laws in relation to those of them issued here. The case coincides, therefore, in principle, with *Holman* v. *Johnson*, with *Hudson* v. *Temple*, and *Lloyd*, v. *Johnson*, above cited ; but it is still stronger than they are, as the contract is not with the very party actually engaged in the illegal transaction, and is for a new and distinct consideration, and so far governed by the analogy, at least, of the rule in *Tolen* v. *Armstrong*, 11 *Wheat.* 256, above cited, " that a promise, unconnected with the illegal act, and founded on a new consideration, is not vitiated by the knowledge of such illegality." These pleas were, therefore, in my judgment, properly overruled by the superior court.

I agree, moreover, with the two courts below, as to the effect of the foreign bills *under five dollars*, illegal by our restraining act, which were left for redemption by Van Duzer with the others. This fact forms no bar to his action, but goes simply to the amount of the recovery at the trial, reducing it by the value of these notes. Judge *Bronson* has put this chiefly on the ground that it is not alleged that the *agreement* extended to these small bills, but merely that a part of the bills, for which payment was demanded, were of that denomination. This is correct, and we have no right to presume an illegal agreement, or to make it out by mere inference. But I rest my own opinion on a broader ground, because even if the illegal redemption of these small bills did enter into the contemplation of the parties, as a part of the contract, and had been so alleged and admitted, the legal result would not have been varied. The agreement is void, so far by the operation of our restraining act, and the amount of the recovery so far diminished ; but the rest of the agreement would stand. " When the transaction is of such a nature that the good part of the consideration can be separated from what is bad, the courts will make the distinction ; for the common law doth decide according to common reason ; and having made that

De Groot *v.* Van Tuzer.

void which is against law, lets the rest stand." 2 *Kent's Comm.* 467, *and cases there cited.* I have read the cases referred to by Chancellor Kent, and rest my opinion upon the reasons assigned in them by Chief Justices Kenyon and Ellenborough, not less than on the authority of the decisions themselves. The only exception to the rule is, where the good and the void consideration are so mixed, and the contract so entire, that there can be no apportionment; which is clearly not the case here. Otherwise, the principle is, that when any matter void by statute is mixed with good matter, entirely independent of it, the good part shall stand, and the rest be void. This rule holds even when the prohibited consideration forms a direct and positive part of the contract. *A fortiori,* it should apply here, when the illegal redemption of a part of the notes issued by the bank (such as might be less than five dollars) was only an accidental and contingent part of the bargain, which might have been literally executed without redeeming a dollar of that sort of paper.

Some other points are brought under our review on the exceptions taken to the charge of Judge Oakley on the trial. I can see no grounds for granting a new trial on these exceptions. The judge's charge appears to be sustained by the evidence as it is before us on paper. Even did it not appear so, I cannot consider it good ground for disturbing a verdict, that the judge erred in the view he took of any fact in evidence, or on the degree of weight he gave to any part of the testimony, provided the whole was submitted to the judgment of the jury, unaccompanied by any misdirection as to the law. The opinion of Chancellor Kent, in the *New-York Firemen's Ins. Co.* v. *Walden,* 12 *Johns. R.* 513, which was sustained by a majority of the court for the correction of errors, settles the general law, and vindicates and marks out the rights of juries. The line between a direction of a judge bearing on the law, and furnishing the ground for setting aside a verdict under it, and an opinion on the facts for the guidance of the jury, must sometimes be shadowy and indistinct; but that of Judge Oakley, especially as to the testimony of *Homan,* I think falls clearly within Chancellor Kent's definition in the

De Groot *v*. Van Duzer.

case referred to.   It is delivered as " a mere opinion, and not as a direction ; and the jury were to decide the fact upon their own view of the case ;" for judge O. stated his view of the testimony, and then added—" If the jury viewed the testimony in the light he had stated, the plaintiff was entitled to their verdict." To set aside a verdict, on such grounds, seems in hostility to the nature and character of the trial by jury. Its effect would be, in a good degree, to substitute a court of review, to whom the evidence comes in a meagre and condensed form, in place of the court and jury, who have the living witnesses before them. The tendency of such an interference, if frequent, would be to cut off from the jury the advantage they may derive from the experience of the judge, whilst at the same time it would abridge their just rights, and habituate them and the bar to look elsewhere than to the honest exercise of their independent judgment, for a correction of any mistake of the judge on the facts submitted to their decision.

The only part of judge Oakley's charge that seems at all open to argument as a misdirection as to the law, is that in which he expressed his view of the authority of the defendant to make a contract as an agent for the bank.   The defendant's counsel alleged that this was a contract with the defendant as president of the bank, in its behalf, as its agent.   The judge charged that it was necessary that the defendant should establish this to the satisfaction of the jury ; that the defendant showed no authority whatever to make this contract on behalf of the bank ; that as president, merely, he had no such right ; and that it did not appear that *there was any resolution of the bank, or any act of the directors, to authorize it ;* that the defendant having thus contracted, in terms which purported to bind him personally, and showing no authority from the bank to bind it, must be considered as contracting with the plaintiff on his own behalf." It was insisted in argument, that a corporation was not now held to such strict rules as formerly, and that it did not require a formal act or resolution to make a contract, or to enable an agent to bind them.   This is true.   Still I see no legal error in the judge's

De Groot *v.* Van Duzer.

language. He states the law as it actually is, although in the briefest and most general terms. There must have been either a formal *resolution,* or some other *act* formal or informal of the directors, by which they gave either a direct agency to the president, or an implied assent, holding him forth as their agent, which the mere naked fact of his being president could not make him.

If it should yet be thought that the judge's words do not convey this view, and left the jury in the dark as to some mode in which the bank could bind itself, I must yet hold, that such an omission would not authorize a new trial, unless the judge's attention was at the time called to the point as material. The reasoning of Chief Justice Marshall, in the latter part of the case of *Tolen* v. *Armstrong,* on which I have so much relied on other points in this case, is conclusive in my mind on this head, even without the aid of the numerous authorities in the courts of this state, sustaining the same doctrine, as cited by the learned counsel for the defendant in error, in the. argument before this court.

On the question being put, *Shall this judgment be reversed ?* the members of the court divided as follows :

*In the affirmative;* The CHANCELLOR, and *Senators* BECKWITH, DOWNING, EDWARDS, HULL, HUNTER, LACY, LAWYER, LEE, H. A. LIVINGSTON, LOOMIS, SPRAKER, VAN DYCK, WILLES—14.

*In the negative:* Senators L. BEARDSLEY, MAYNARD, SKINNER, STERLING, VERPLANCK, WAGER—6.

Whereupon the judgment of the supreme court was REVERSED, and the necessary orders entered.