Sprague v. Rooney.

SPRAGUE *et al.* v. ROONEY *et al., Appellants.*

DIVISION ONE.

1. **Married Woman**: SEPARATE ESTATE.  A married woman can deal with her equitable separate estate as a *feme sole.*

2. **Contract**: PAROL EVIDENCE : ILLEGAL CONSIDERATION.  A contract, under seal, in the form of one for sale of land, may, in a suit for specific performance, be shown by parol evidence to be in fact a lease, made in violation of the statute, against letting premises for bawdy-house purposes. (*Overruling Sprague v. Rooney,* 82 Mo. 493.)

3. ——— : ——— : PLEADING.  Such parol evidence was admissible under the general denial of the answer.

*Appeal from Jackson Circuit Court.*—HON. J. H. SLOVER, Judge.

REVERSED AND REMANDED.

*William Parmalee* for appellants.

(1) Mrs. Rooney at time contract was entered into with Bessie Sprague was a *feme covert*, and under the decision in *Martin v. Colburn*, 88 Mo., page 229, her husband must join her in making a conveyance of her separate estate ; yet it must not be forgotten that she did not have the *"jus disponendi"* of this property ; the trust was created for her heirs as well as her, and she must comply with the conditions of the deed before the trustee would have been warranted in conveying. In this case Mrs. Rooney has neither complied with the provisions of the deed, nor has she complied with the law of the state respecting conveyances. Mrs. Rooney never received the monthly payments as a part of the purchase price of the premises. She received the money as rent, treated the contract as a lease, and for that reason refused to convey, or direct the trustee, in writing or otherwise, to do so ; therefore, doctrine of estoppel will not apply. (2) The decision of this court in this case reported in 82 Mo. 493, is not in accord with any decision we can find on this subject. The following cases say that all contracts, in whatever form made, for the purpose and with the intention of furthering an illegal subject, are void. *Brua's Appeal*, 55 Pa. St. 299 ; *Guenther v. Dewein*, 11 Ia. 133, 135 ; *White v. Buss*, 3 Cush. 448 ; *Reynolds v. Nichols*, 12 Ia. 402, 403 ; *Fowler v. Scully*, 72 Pa. St. 467 ; *DeGroot v. Van Duzer*, 20 Wend. 390.

*Junius W. Jenkins* and *Charles W. Clark* for respondents.

(1) The estate of Mrs. Rooney in the land being an equitable separate one, it was not necessary for her husband to join in the conveyance of the land. *Turner v. Shaw*, 96 Mo. 22. (2) The contract of sale could not be converted into a lease by parol evidence. This was decided on the former appeal. 82 Mo. 493.

Sprague v. Rooney.

When a case is the second time in this court, only such questions will be noticed as were not determined in the previous decision; whatever was passed upon will be deemed *res adjudicata*, and no longer open to dispute or further controversy. *Overall v. Ellis*, 38 Mo. 209; *Bank v. Taylor*, 62 Mo. 338.

SHERWOOD, P. J.—This cause has been here before, and reported in 82 Mo. 493. It is and was an equitable proceeding for specific performance of the following contract:

"This article of agreement entered into this twentieth day of February, 1878, by and between Catherine of the one part and Bessie Stevenson, of the second part, witnesseth: That the said Catherine has this day bargained and sold, to said Bessie Stevenson for the sum of $2,500, the following real estate lying and being in the city of Kansas, county of Jackson, state of Missouri, namely: Lot number 11, block 3, Lykin's addition to the City of Kansas, old town, as the same appears on record of the recorded plat of said addition, upon the following terms and conditions, to-wit: The said Bessie Stevenson to pay the sum of $25 per month, payable monthly, on the twentieth day of each month, until the sum of $1,000 is thus paid, then the said Catherine Rooney to execute and deliver to the said Bessie Stevenson a good and sufficient warranty deed to the same, taking the notes of said Bessie Stevenson, secured by deed of trust on the property conveyed, for the same deferred payments. But if said Bessie Stevenson fail or refuse to make any monthly payments as herein provided, until deed made, her rights under this agreement to cease, and said Catherine Rooney to be immediately entitled to the possession of said real estate.

"In witness whereof the parties have set their names and affixed their seals to duplicate copies hereof, one to be retained by each, the day and year aforesaid.

"[ Seal. ]          MRS. CATHERINE ROONEY,
"[ Seal. ]          MISS BESSIE STEVENSON."

The defense then made in effect was that the contract, though in form a *sale*, yet was in reality a *lease*, drawn in the form of a sale in order to evade the statute respecting the leasing of premises for a bawdy-house; for which purpose the then plaintiff intended using it.

A replication put in issue the allegations of the answer, and on the hearing the issues were found in favor of the defendant, and judgment accordingly, but on appeal to this court that judgment was reversed and cause remanded. When the cause reached the lower court again, however, the answer and defense were changed; the former consisting of a general denial, and an allegation, that, at the time the contract mentioned was made, Catherine Rooney was a married woman, etc., and hence that contract was void, etc., etc. A reply was filed to this answer setting forth that Catherine Rooney, though a married woman, had an equitable separate estate in the property in controversy, etc., etc.

By agreement of parties, the testimony of Catherine Rooney, taken at a former trial, but who had died in 1884, as well as that of Bessie Sprague taken at the same time, might be read in evidence, by either party, subject only to objections for irrelevancy or incompetency.

Pursuant to this stipulation, the plaintiff introduced in evidence a portion of the testimony of Bessie Sprague, as follows: "I am the plaintiff in this case; I know the defendant, Catherine Rooney, and have known her several years. I am acquainted with the property in controversy in this suit. In the month of February, 1878, and a short time prior to the twentieth day of that month, I went to see Mrs. Rooney about renting the property in controversy. I saw her at her house in Kansas City. I told her I would like to rent the house that I had heard she had offered to rent it to Mollie Wilson for $15 a month, and that I would like to rent it if I could get it on reasonable terms. Mrs. Rooney then asked me why I did not buy the property. I

answered that I had not thought of buying the property, as I did not have money to pay for it. She said that she would sell it to me on such easy terms that I could pay for it. I asked her on what terms, and she said for $2,500, and that I could pay her $25 per month until I had paid her $1,000, when she would give me a deed to the property, and I could then secure the balance of the money to her by a deed of trust on that property. She urged me to do this, and said if I bought it it would then be mine. I told her I would take the property, as I thought I could pay for it on those terms, and she would have the contract between us drawn up, so that we could sign it the next time I came. I called to see her again in a day or so, I cannot remember exactly how long it was, and we signed the contract sued on in this case. I paid her the first installment of $25 on the twentieth of February, 1878, and took possession of the property, which I have retained ever since, either myself or tenant. When I took possession of the property it was in very bad repair. Many of the window lights were out, a great many of the keys and door latches were gone ; some of the plastering off and one or two doors down. Before moving into the house I had it repaired by putting in the window lights and fixing the plastering, hanging the doors and fitting them with keys and latches, and by preparing two of the rooms. I have since that time had the premises repaired on several occasions and have made a number of improvements, all of which have been paid for by me. I have twice had the house painted, a part of it twice papered. I had a partition built across one of the rooms, thus converting it into two rooms. I had a window put in the south side of the house. I had the kitchen repaired, and the floor taken up and brick laid under it to keep the rats out. I had a new pump put in the cistern. I had a new bridge put at the approach to the house from the front ; and I had a new front put into the house. The

repairs and improvements altogether cost at least $450. All of which was paid for by me. Mrs. Rooney made no repairs or improvements on the property since the contract was made."

Plaintiff then read in evidence the following portion of the testimony of Catherine Rooney: "I am one of the defendants in this case, and am acquainted with plaintiff. In the month of February, 1878, I owned the property in controversy. The property was vacant and unoccupied by a tenant. After we had made this agreement I had my husband, John Rooney, write the paper on file with the petition, which on or about February 20, 1878, was signed by myself and plaintiff; and she paid me $25 and took possession of the property."

The defendants also offered in evidence the following portion of the testimony of Catherine Rooney: "I am one of the defendants in this case, and am acquainted with the plaintiff. In the month of February, 1878, I owned the property in controversy; the property was vacant and unoccupied by a tenant. The plaintiff about that time came to me to rent said property. She had lived in the house as my tenant before. I agreed to rent her the house at $25 per month, payable at the twentieth day of each and every month in advance; $25 was a reasonable rent for the house at that time. I knew that plaintiff wanted said house for the purpose of being used or kept as a brothel or bawdy-house. She told me she expected to keep some girls. I knew the statutory penalty for leasing or renting a house for such purposes, and in order not to incur the pains and penalties of the law, and to keep from being indicted, I did not execute and deliver a lease of the premises to the plaintiff; but the plaintiff and I agreed that our contract should be drawn up in the shape of a sham sale. The contract was never intended to be a sale of the property, as it purports to be on its face, but was made for the sole purpose of evading the law against

knowingly leasing a house for the purpose of being used or kept as a bawdy-house or brothel. I have paid the taxes on said property ever since said contract was made, and have been collecting rent from one Clara Despain, who now occupies said premises, since about August 20, 1881. I have also kept the property insured. I was to keep the premises in repair and I did keep them in repair. * * * Nobody except the plaintiff, myself and *God Almighty* were present when I signed the contract sued on, or at any time of the conversations between us respecting the property before the contract was signed. I did not want anyone to know the nature of the transaction. When plaintiff rented the property of me before, she left before the end of the first month, and returned the keys and contract to me and said she was going away because she was unable to furnish the house; $25 a month was a fair rental for the property at that time.

"I had previously rented it for that, except in the grasshopper times. I have made improvements on the property since February 20, 1878. I had a bridge built which leads from the street to the house, across a kind of a gully or ravine, which I paid for. I cannot say how much I paid for it, as the man who did the work took it out in board, but it was about $6. Plaintiff did not have the bridge built to which I have referred. I had it built, and paid for it myself. I was not a frequent visitor at the plaintiff's house, but have been there several times."

This testimony was received by the court subject to the objection of plaintiffs.

The defendants then introduced in evidence another portion of the testimony of Bessie Sprague as follows: "I have been the keeper of a brothel or bawdy-house, and I went to Mrs. Rooney to get this property for that purpose, and I did keep a brothel there after I got it. Mrs. Rooney did not ask me whether I intended to keep a bawdy-house. I would have considered it an

impertinent question from her, as she knew the kind of a woman I was. I went to see Mrs. Rooney about renting the house because I had heard that she had been trying to rent it to Mollie Wilson for $15 per month. I did rent the rooms from Mrs. Rooney once before, I think about November, 1877, for $25 per month. I then paid my rent in advance and took possession and left in about two weeks, because I found I could not pay that rent, and had an opportunity to get a cheaper house. The contract between us was in writing. I don't know that I ever read the contract that we had between us at that time. I left the house in about two weeks, and turned over the contract and keys to Mrs. Rooney. I was anxious to get the house and paid but little attention to the writing. My impression is, however, that the writing was similar in its provisions to the one sued on. Mrs. Rooney said at the time that in order to keep herself from being indicted she would have the contract between us fixed in the shape of a sham sale, which I supposed she did. I, therefore, think that that contract was similar to this one to the extent of its appearing to be a sale. Whether or not it was similar in all its provisions I cannot say. I don't know whether Mrs. Rooney had the contract sued on copied from that or not. The real contract in November, 1877, was that I was to rent the property at $25 per month payable in advance. It is not a fact that the real contract sued on at the time it was signed was a renting at $25 per month. Mrs. Rooney sold me the property just as the contract states, and it was so understood between us. I never heard anything to the contrary until I had paid her the thousand dollars, and she refused to make me the deed. I never paid any taxes on the property; I didn't suppose I had to pay any taxes on the property until I got my deed."

It was also shown by plaintiffs that Bessie Sprague had fully complied with the contract aforesaid by the payment of $1,000 to Mrs. Rooney, and by the tender to

her of the contemplated notes and deed of trust; but she refused to receive them or to make a deed to Bessie Sprague.

It was also shown that Catherine Rooney, although a married woman, had an equitable separate estate in the litigated premises. Other facts appear of record, but it is unnecessary to state them, owing to the views taken of those already stated.

I. Catherine Rooney, although a married woman, yet, being possessed of an equitable separate estate in the litigated property, had as much capacity to deal with that property as if she had been a *feme sole.* *Turner v. Shaw*, 96 Mo. 22, and cas. cit.

This being the case, the fact that Catherine Rooney was a married woman at the time she executed the contract in controversy raises no barrier whatever, in and of itself, to the success of the plaintiff in the present proceeding. There are other considerations, however, respecting that contract, which have a more important bearing as to the force and effect of that instrument considered with reference to the facts disclosed by this record.

II. Section 3816, Revised Statutes, 1889, which corresponds with section 1551, Revised Statutes, 1879, provides that "every person who shall knowingly lease or let to another any house or other building * * * for the purpose of being used or kept as a * * * brothel, or bawdy-house, shall, on conviction, be adjudged guilty of a misdemeanor and punished by fine not exceeding $500."

A preceding section also makes it a misdemeanor for any person to keep a bawdy-house or brothel. Sec. 3811.

Under these statutory provisions and prohibitions there can be no doubt that a lease made in violation of such statute cannot be enforced. And, at common law, a bawdy-house is a common nuisance *per se.* *Clementine v. State*, 14 Mo. 112. And "to conduct such a

place, or to lease property for such a purpose, is a public wrong." *Givens v. Van Studdiford*, 86 Mo. 156. In *Ashbrook v. Dale*, 27 Mo. App. 649, it was ruled that a contract to rent a house to be used as a brothel is illegal, and no recovery can be had on such contract, or on an implied contract, for such leasing.

If there be one principle of the law well settled it is this: That a contract, expressed or implied, based on an illegal consideration, whether that consideration appear on the face of the contract or be proved *aliunde*, cannot be enforced either at law or in equity; that the moment the illegality of the contract is disclosed the gates of legal and equitable relief and remedy are at once shut against the party who seeks to enforce such a contract. Nor is it necessary that such contract, when it violates the provisions of a statute, should be declared void by that statute in order that the courts should refuse to enforce it, when relief based upon it is asked at their hands. These positions are sustained, perhaps, by as great an array of authorities as is to be found on any other one topic of the law.

Thus in the case of *Bank v. Owens*, 2 Peters, 538, JOHNSON, J., said: "No court of justice can in its nature be made the handmaid of iniquity. Courts are instituted to carry into effect the laws of the country; how can they become auxiliary to the consummation of violations of law. * * * There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal." The same principles are recognized in *Coppell v. Hall*, 7 Wallace, 558. Justice SWAYNE, commenting on the instruction of the court below, that the illegality had been waived by the act of the defendant, says: "In such cases there can be no waiver. The defense is allowed not for the sake of the defendant, but of the law itself." Again, "Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the

defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded on its own violation." In *Mitchell v. Smith*, 1 Binney, 110, a case of the sale and purchase of a Connecticut title to Pennsylvania lands, SHIPPEN, C. J., says : "The contract is illegal, being founded on the breach of the law, and of consequence a void contract, and cannot be enforced in a court of law."

In *Seidenbender v. Charles, Adm'r*, 4 S. & R. 151, it was held there could be no recovery upon a ticket in an illegal lottery. TILGHMAN, C. J., said : "I consider it perfectly settled, that an action cannot be sustained, founded on a transaction prohibited by statute, although it is not expressly declared that the contract is void." P 160. YEATES, J., said : "The principle of public policy is, that no court will lend its aid to a man who grounds his action upon an immoral or illegal act. Justice as between these individuals would require either payment of the money or reconveyance of the property ; but principles of public convenience demand that the justice of the case shall yield to higher considerations, the operation of the precedent on public morals, and the public interest. It is for these reasons courts of justice will not assist an illegal transaction in any respect." To the same effect see *Fowler v. Scully*, 72 Pa. St. 456 ; *Brua's Appeal*, 55 Pa. St. 294 ; *De Groot v. Van Duzer*, 20 Wend. 390 ; *Reynolds v. Nichols*, 12 Iowa, 398 ; 2 Kent's Com. [13 Ed.] 466, and cas. cit. ; *Sumner v. Summers*, 54 Mo. 340 ; *Cheltenham v. Cook*, 44 Mo. 29 ; *Kitchen v. Greenabaum*, 61 Mo. 110.

In *White v. Bass*, 3 Cush. 448, SHAW, C. J., said : "It is well settled by the authorities, that any promise, contract or undertaking, the performance of which

would tend to promote, advance or carry into effect an object or purpose which is unlawful, is in itself void, and will not maintain an action. The law which prohibits the end will not lend its aid in promoting the means designed to carry it into effect, and in this respect the law gives no countenance to the old distinction between *malum in se* and *malum prohibitum*. That which the law prohibits, either in terms or by fixing a penalty to it, is unlawful; and it will not promote, in one form, that which it declares wrong in another."

And it does not at all alter the principle to be applied in such cases, because the instrument declared on is in *one form*, while the statute levels its denunciations and penalties at an instrument in *another form*. The law looks at the *substance* of things; not at their *shadows*. To say that the law prohibits a *lease* being made of a house to be used as a bawdy-house, and that the courts will refuse to enforce *such* a contract; but that if such contract takes on the form of *deed or contract of absolute sale*, that then the courts would have to enforce such a *subterfuge*, is unsustained by either reason or authority, and at war with both.

In this case the evidence, which was entirely competent for that purpose, tends very strongly to show the illegality of the contract aforesaid. In such case, such evidence is not introduced to "*vary or control the contract;*" but to show that in contemplation of law, in consequence of the proven illegality, *no contract at all ever had an existence;* that it was void *ab initio*. 2 Parsons on Cont. [6 Ed.] 554; 1 Greenl. Ev. [14 Ed.] sec. 284, and cas. cit. The case of *Sprague v. Rooney, supra,* is opposed to this view, but, that case being without support in reason or precedent, we overrule it.

III. But one point remains for discussion, and that assumes the form of a question: Under the general denial in the answer was the testimony aforesaid admissible? The answer to this must be in the affirmative. The effect of that portion of the answer referred

to was to deny that there was any *legal* contract in existence, and, therefore, that plaintiffs had no standing in court.   Bliss on Code Plead. [2 Ed.] secs. 324–352; *Northrup v. Ins. Co.*, 47 Mo. 435 ; *Greenway v. James*, 34 Mo. 328 ; *Corby v. Weddle*, 57 Mo. 452 ; *Young v. Glascock*, 79 Mo. 574.

IV.   This cause was evidently heard and determined under the influence of the erroneous ruling made when it was here before.   In order that it may be reheard and determined under more favorable auspices, and upon a correct theory of the law, we reverse the judgment and remand the cause.   All concur.

## SEPARATE OPINION.

BARCLAY, J.—It appears to me that the evidence referred to in the opinion of the learned chief justice was admissible as tending to show that the so-called agreement of sale, though in writing, never acquired original vitality as a contract, because of illegality (for which, it is claimed, it was a cover) in the real transaction between the parties.

Such evidence is not regarded as infringing the general rule excluding verbal testimony to contradict or vary a writing.   *Tracy v. Union Iron Works Co.*, 104 Mo. 193.

In my opinion it was admissible under the pleadings in this case.   For these reasons my concurrence is given to reversing and remanding.