### (INSTANCE COURT.)

## The Edward.—SCOTT, Claimant.

In revenue, or instance causes, the circuit court may, upon appeal, allow the introduction of a new allegation into the information, by way of amendment.

Under the 3d section of the act of congress, of the 28th of June, 1809, every vessel bound to a foreign *permitted* port, was obliged to give a bond, with condition not to proceed to any port with which commercial intercourse was *not permitted*, nor to trade with such port.

Where the evidence is sufficient to show a breach of the law, but the information is not sufficiently certain to authorize a decree, the supreme court will remand the cause to the circuit court, with directions to allow the information to be amended.

APPEAL from the circuit court for the district of Massachusetts. The offence charged in the information filed in this case, in the district court of Massachusetts, is, that the ship Edward, on the 12th day of February, 1810, departed from the port of Sa

vannah with a cargo, bound to a foreign port with which commercial intercourse was not permitted, without a clearance, and without giving a bond in conformity with the provisions of the act of congress of the 28th of June, 1809.  A claim was interposed by George Scott, of Savannah, in which he alleged, that the ship did not depart from Savannah, bound to a foreign port, in manner and form as stated in the information.  The district court condemned the ship; from which sentence an appeal was taken to the circuit court, where the district attorney was permitted by the court to amend the information, by filing a new allegation, that Liverpool, in Great Britain, was the foreign port to which the ship was bound when she departed from Savannah, and that she did so depart without having a clearance, agreeably to law.  The circuit court affirmed the sentence, and the cause was brought before this court upon an appeal.

*Harper*, for the appellants and claimant.  1. The object of the 3d section of the act of the 2d of June, 1809, was to prevent the going to *prohibited* ports. When this supposed offence was committed, there were no prohibited ports, and the legislature could never mean to attach the penalty to ports *permitted* temporarily.  If Liverpool was not, at the time, a prohibited port, and there were no other prohibited ports, the vessel was not obliged to give bond.  Before the voyage was undertaken, it had become impossible to commit the offence with which the vessel is charged.  2. The information charges the vessel

with going to a *forbidden* port without a clearance. But Liverpool was not a forbidden port, and, therefore, the information cannot stand. 3. The allegation was, that the vessel proceeded from Savannah; but the proof was, that the voyage was undertaken from Charleston. The prosecutor could not lawfully prove a proceeding from any other port than that alleged in the information.

<span style="float:right">1816.<br>The<br>Edward.</span>

The *Attorney-General* and *Law*, for the respondents, argued, 1. That the laws, under which the supposed offence was committed, were in force at the time. [But as the argument is fully stated in the opinions of the judges, it is omitted here.] 2. Common law strictness is not required in these proceedings, and it is unreasonable to insist on the particular foreign port being named. The prosecutor had a right to prove a voyage from Charleston. It has been decided in this court, that it is sufficient if the offence be laid *in the words of the act.* Even the rules of the common law applicable to indictments do not require time and place to be proved as stated; and the only case where a variance is fatal is, where it affects the jurisdiction of the court, as where criminal proceedings are required to be local.[a] In no case, in civil proceedings, does the common law consider the venue as matter of substance, except where both the proceedings are *in rem,* and the effect of the judgment could not be obtained if the offence were laid in a wrong place.[b] The circuit court had a

a 2 *Hawk.* c. 25. s. 83. c. 23. s. 88. 91. 2 *Hale's P. C.* 179, 180.
b *Cowp.* 176.

1816.

The-
Edwaid.

right to amend the proceedings, but the practice of
this court is to remand the cause to the circuit court
with directions to amend.

March 15th.     WASHINGTON, J., delivered the opinion of the
court, and, after stating the facts, proceeded as fol-
lows :

Three questions have been made and discussed by
the counsel, 1st. Whether the circuit court could,
upon the appeal, allow the introduction of a new
allegation into the information by way of amend-
ment ?    2d. Whether the omission to give the bond
required by the 3d section of the act of the 28th of
June, 1809, subjected the vessel to forfeiture ? and
if it did, then, 3d. Whether the information, which
alleges the voyage to Liverpool to have commenced
at Savannah, is supported by the evidence in the
cause, and whether the sentence below ought not to
be reversed for this reason, although the court should
be satisfied that the ship departed from Charleston
for Liverpool without giving the bond required ?

Upon the first question it is contended, for the
claimant, that the circuit court has only appellate
jurisdiction in cases of this nature, and that to allow
the introduction of a new allegation, would be, in
fact, to originate the cause in the circuit court. This
question appears to be fully decided by the cases of
the Caroline and Emily, determined in this court.
These were informations *in rem*, under the slave trade
act, and the opinion of this court was, that the evi-
dence was sufficient to show a breach of the law;
but that the informations were not sufficiently cer-

tain to authorize a decree. The sentence of the
circuit court was, therefore, reversed, and the cause
remanded to that court, *with directions to allow the
informations to be amended.* But even if an amend-
ment would be improper if it stated a different case
from that which was presented to the district court,
the objection would not apply to this case, in which
the offence, though more definitely laid in the second
allegation than it was in the first, is yet substantially
the same. In both of them the charge is, departing
from Savannah to a foreign interdicted port without
giving bond, and the amendment, in substance, merely
states the particular foreign port to which the vessel
was destined.

The next question is, whether the omission to give
the bond required by the third section of the act of
the 28th of June, 1809, subjected the vessel to for-
feiture? It is contended, by the claimant's counsel,
that after the end of the session of congress in which
this law passed, there were no foreign ports either
*permitted* or *interdicted* by law, inasmuch as the em-
bargo laws which prohibited exportations from the
United States to foreign countries, would then stand
repealed, by force of the 19th section of the act of
the 1st of March, 1809, to interdict the commercial
intercourse with Great Britain and France, and the
2d section of the above act of the 28th of June.
That all the ports of the world being thus permitted
to the commerce of the United States, no subject
would remain on which the 3d section would ope-
rate; and, consequently, there could be no necessity
for giving a bond not to go to an interdicted port.

An attentive consideration, however, of the two acts above mentioned, will show that the argument is not well founded. The 3d section of the act of the 28th of June, 1809, declares, that during the continuance of that act, no vessel, not within the exceptions therein stated, shall be permitted to depart for a foreign port with which *commercial intercourse* has not been, or may not be, permitted by virtue of this act, or the act of the 1st of March, 1809. And if bound to a foreign port with which commercial intercourse has been, or may be, *permitted*, still she shall not be allowed to depart without bond being given, with condition not to proceed to any port with which commercial intercourse is not thus permitted, nor be directly or indirectly engaged, during the voyage, in any trade with such port. This law was in full force at the time the offence charged in this information is alleged to have been committed.

If, then, there was any country with which commercial intercourse was interdicted, and would continue to be so after the end of the session, during which this law was passed, it seems to be admitted in the argument, that a vessel destined to a foreign permitted port would be liable to forfeiture, unless the above bond had been given. To ascertain whether there was any such country, it will be necessary to inquire what is the true meaning of the term *commercial intercourse?* No higher or more satisfactory authority upon this subject need be resorted to than the legislature itself, by which this act was passed.

The act of the 1st of March, 1809, which is entitled, "An act to interdict the *commercial intercourse*

between the United States and Great Britain," &c., contains nineteen sections. The first ten (exclusive of the first, which denies to the vessels of those countries the privilege of entering the ports and harbours of the United States) forbid the importation into the United States of the products and manufactures of Great Britain and France, or of any other part of the world, if brought from the ports of either of those countries. The 12th section repeals, after the 15th of March, 1809, all the embargo laws, except as they relate to Great Britain and France; and the 19th section repeals them, after the end of the succeeding session of congress, as to all the world. The 13th, 14th, 15th, 16th, and 18th sections are intended to provide securities for enforcing the non-importation system established by this law; and the 17th section repeals the former non-importation law of April, 1806.

Hence, it appears, that the commercial intercourse which this law was intended to interdict, consisted of importations from Great Britain and France, and of the products and manufactures of those countries, and of exportations to them. In the 11th section it is called *the trade* of the United States, suspended by that act and the embargo laws, which trade the president is authorized to renew, by his proclamation, upon a certain contingency, and in pursuance of this power, he did, accordingly, renew it with Great Britain in April, 1809.

Thus stood the commercial intercourse of the United States with foreign nations, at the commencement of the extraordinary session of congress, which

commenced in May, 1809; *permitted* by the above law, both as to exportations and importations with all the world, except Great Britain and France, and their dependencies; and, as to them, *interdicted* in both respects as to France, and permitted with Great Britain, by virtue of the president's proclamation. But, as the law of the 1st of March would expire, by its own limitation, after the end of the May session, whereby, not only exportations, but the importations forbidden by that act, in relation to France, would become lawful; the 1st section of the act, of the 28th of June, 1809, revives the whole non-importation system, except so far as it had been permitted to Great Britian by the proclamation; and the 2d section declares, in effect, that the embargo laws, which were repealed by the 12th and 19th sections of the act of the 1st of March, shall be and remain repealed, notwithstanding the expiration of that law by its own limitation.

From this view of the subject, it appears, that the non-importation system of the 1st of March was to continue in force until the end of the session of congress, which would succeed that of May, 1809, except as to Great Britain; and that, after the end of that session, the embargo laws would cease to operate against any nation.

If, then, *importation* be a branch of commercial intercourse, in the avowed meaning of congress, and if, on the 28th of June, and from thence until the end of the next session of congress, it was to continue in force, as to France, (unless the president should declare, by proclamation, the revocation of

her offensive edicts,) but were inoperative as to Great Britain, it follows, inevitably, that, in February or March, 1810, when the offence is charged to have been committed by this vessel, there were foreign ports *permitted*, and others interdicted, to the commerce of the United States; and, consequently, that the destination of this vessel being to Liverpool, a bond ought to have been given, such as the 3d section of the act of the 28th of June required, not to go to an *interdicted* port.

This construction of the law has frequently been given to it by this court: but the serious opposition made to it, by the counsel for the claimant, will account for the deliberate examination of the question which is contained in this opinion.

As to the last question, a majority of the court being of opinion, upon a view of the whole evidence, that the voyage to Liverpool had its inception at Savannah, the objection as to the form of the information, in this respect, has nothing to stand upon. Were the evidence, on this point, more doubtful than it is, the court would remand the cause, with directions to the circuit court to allow an amendment, by inserting *Charleston* instead of Savannah, from which the claimant could derive no benefit, since it is not denied that the ship departed from *Charleston* directly for Liverpool, without giving bond.

LIVINGSTON, J. This ship was proceeded against under the 3d section of the act of the 28th of June, 1809, for sailing from the United States to a foreign port with which commercial intercourse had not

been, nor was then, permitted, by virtue of that act, or of the act to interdict commercial intercourse between the United States and Great Britain and France, without a clearance, and without a bond having been given, in conformity to the provisions of the said act, not to proceed to any port with which commercial intercourse was not then, by law, permitted, nor be directly or indirectly engaged, during the voyage, in any trade or traffick with such place.

The only question, on this part of the case, is, whether, at the time of the departure of the Edward from Savannah, which was in February, 1810, there existed any law subjecting her to forfeiture if the owner omitted giving the bond prescribed by the 3d section of the act above mentioned.

By the claimant, it is contended, that after the end of the session of congress, in which this act passed, which occurred on the 28th of June, 1809, there ceased to exist in the United States any distinction between prohibited and permitted ports within the meaning of the restrictive system; that the embargo laws, which alone restricted exportations to foreign countries, had, at that time, become repealed by the operation of the last section of the act of the 1st of March, 1809, as well as by that of the 2d section of the act of the 28th of June of the same year; that by this repeal the whole world, as far as could depend on our own laws, was open to the vessels of the United States, and, consequently, that it could not be illegal to neglect giving a bond not to go to an interdicted port, if, at the time of sailing, there was

no port in the world to which that interdiction could
apply.

In examining this question, my attention will be
confined to a consideration of the two acts which
have just been mentioned; because, if the interdic-
tion which is supposed to have existed when the
Edward left Savannah, is not to be found in either
of these laws, no other has been referred to as crea-
ting it. Let us, then, see what has been done, and
if there be no ambiguity in the provisions of these
two acts on the subject before us, it will be safer, in a
case so highly penal, to adhere to the letter of them,
than to incur the danger of falling into error by in-
dulging in a mode of interpretation which was adopt-
ed at the bar, and which was too conjectural to be
in any degree satisfactory.

By the 12th section of the act of the 1st of
March, 1800, the embargo law was repealed as to
all nations, except Great Britain and France, and
their dependencies. This repeal, necessarily and
immediately, created a distinction between ports
with which commercial intercourse was *permitted*,
and those to which it was *interdicted*; and we ac-
cordingly find congress, in the very next section of
this act, providing for this new state of things, by
requiring bonds to be given when vessels were going
to ports which had now become permitted ports,
not to proceed to any port or place in Great Britain
or France, &c. No such regulation had been pre-
scribed in consequence merely of the non-importa-
tion law, and for the plainest reason; for, while
they prohibited an introduction into the United

States, from any part of the world, of the produce and manufactures of France and England, our vessels were allowed to go to those countries, and thus continue a commercial intercourse with either or both of them, limited, it is true, as to the articles which might be brought from thence, but uncontrolled as to the commodities which might be carried thither, or as to the port to which they might go. This partial trade between the two countries, whether originating in the acts of the one government or the other, may frequently take place; but cannot, when it does, with any propriety, be termed an interdiction or suspension of commercial intercourse, which, *ex vi termini*, means an entire cessation, for the time being, of all trade whatever. It was under the embargo laws alone that intercourse was interdicted between this country and Great Britain and France, as it was also with the rest of the world; which interdiction, as it arose out of those laws, so it is expressly continued, as it regards those two kingdoms, by excepting them out of the operation of the 12th section of the act of the 1st of March, 1809, which repealed the embargo laws as to all other parts of the world. It would seem, then, that after this, no other inquiry would remain than to ascertain whether the commercial intercourse thus interdicted by the act laying an embargo, and continued, or rather not repealed, as it respected Great Britain and France, by the 12th section just mentioned, was still in force at the time this offence is alleged to have been committed. Without leaving the act now under consideration, we find that it was

to continue in force only until the end of the next session of congress, and that the act itself, which lays the embargo, was to expire at the same time. This event took place on the 28th of June, 1809. Now, unless some law were passed before that time to continue the embargo longer, or, after that period, to revive it, how can it be said that, after that day, a distinction could still continue between prohibited and permitted ports? This brings us to see whether any thing was done by congress at the extraordinary session which commenced in May, 1809. By an act which they passed on the 28th of June of that year, they continued in force until the end of the next session, which happened on the 1st of May, 1810, the 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 17th, and 18th sections of the act of March, 1809, and they declare, that all the acts repealed by the said act, shall remain repealed, notwithstanding any part of that act might expire by its own limitation. Now, if we return to the sections which are revived, we find them containing nothing more than an inter-diction of the harbours and waters of the United States to vessels sailing under the flag of Great Britain or France, or owned by subjects of either, accompanied with a prohibition to import *from any foreign port whatever*, into the United States, any goods, &c., being of the growth, produce, or manufacture of those countries, or their dependencies. In not one of them is found a prohibition to our citizens against trading with either of those countries. Their revival, then, does not operate so as to create a single interdicted port in the whole commercial world.

Such interdiction, as has already been said, was a creature of, and owed its existence solely and exclusively to, the embargo laws. If it be said that such prohibition necessarily flowed from the revival of these sections, notwithstanding their entire silence on the subject, then would our vessels have been under a disability of going to any part of the world, because they were no more at liberty to bring British and French goods from other countries than from Great Britain and France; and yet the 12th section of this act, by only taking the embargo out of their way, permitted them to go to any port of the world except to Great Britain and France. But, in availing themselves of this permission, they were still under a restraint not to bring to this country any British or French goods. The 11th section of the act of March, 1809, which is continued by that of June of the same year, authorizes the president, in certain cases, to issue his proclamation; after which, the trade of the United States, *suspended by that act,* and by the embargo law, may be renewed with Great Britain or with France, as the case may be. In this section we are presented with a distinction, taken by the legislature themselves, and which, indeed, pervades the whole system between the suspension of trade created by that act, and by the embargo laws. The two systems were entirely different, and enforced by different and distinct penalties. By the one, our vessels were at liberty to go where they pleased; by the other, they were prevented from going to any foreign port whatever. The revival, then, of these sections, did not preclude

our vessels from going to any part of the world, but only forbid their bringing to this country the articles whose importation was prohibited. If the 12th section had also been revived, then no vessel of the United States could have gone to Great Britain or France, and the distinction of permitted and forbidden ports would have continued until the 1st of May, 1810. But as the whole embargo system expired in June, 1809, not only by the 19th section of the act of March, 1809, but also by the express provision of the act of June of the same year, the conclusion is inevitable, that when the Edward sailed there was no law in force by which any distinction of prohibited and permitted ports existed; and that, therefore, the not giving the bond in question was no violation of law.

No notice has been taken of either of the proclamations of the president, because, if the view here presented be correct, neither of them has any bearing on the question. Admitting the validity of both of them, the latter would not make the ports of England prohibited ports, if the laws which created the distinction, had done it away by opening to the citizens of the United States the ports of every nation on the globe. The president's power could only exist while such a state of things continued as suggested the necessity of, and would render, an interference on his part proper and useful, and no longer.

It may be, and has been, said that the opinion here expressed is at variance with the public opinion on this subject, as well as with the understand-

1816.<br>The<br>Edward.

ing of the collectors and some other officers of government; and that even this court has, at its present term, condemned property for the same offence with which the Edward is charged. The answer to all this is, that the condemnation alluded to passed *sub silentio*, without bringing the point distinctly to our view, and is, therefore, no precedent; and that, as to public opinion, or that of the officers of government, however respectable they may be, it can furnish no good grouds for enforcing so heavy a penalty, unless, on investigation, it shall appear to have been correctly formed. It was also urged that congress must have supposed the law to be as it is now contended for by the attorney-general, or they would not have passed the 3d section of the act of the 28th June, 1809, when there was no state of things to which its provisions could apply. To this the answer which was given at the bar is satisfactory. At the time of the bringing in of that bill, the embargo laws were still in force, and would continue so until the end of that session. Now, as it could not then be foreseen that the bill would not become a law until the last day of the session, a prohibition not to go to prohibited ports was necessary, but became nugatory by the law not passing until the time prescribed for the extinction of the whole system

Upon the whole, it appears to me clear, that there was no law in force when the Edward left Savannah interdicting her from going to any foreign port whatever, or requiring from her owners any bond not to go to such port; and, under this persua-

sion, I have thought it a duty to express my dissent from the judgment which has been just rendered.

But were the case doubtful, I should still arrive at the same conclusion, rather than execute a law so excessively penal, about whose existence and meaning such various opinions have been entertained.

To satisfy ourselves that great difficulties must exist, in relation to this law, we have only to look at the progress of the case now before us. The offence with which the Edward is charged in the information, is going, without giving bond, to a prohibited foreign port. The condemnation in the circuit court, however, proceeded on the ground of all the ports of Great Britain (to one of which it was alleged she was going) being *permitted* ports. In the very able argument which was made here in support of the prosecution, it was attempted to be shown that Liverpool was not a *permitted*, but an *interdicted*, port. This state of uncertainty, which, it would seem, could hardly exist if the legislature had expressed themselves with that precision and perspicuity which are always expected in criminal cases, would, with me, independent of my own convictions that there was no such prohibiting law, have been a sufficient reason for restoring this property to the claimants.

### Sentence of the circuit court affirmed.[c]

[c] In order to enable the reader the better to understand this case, the following account of the dates and substance of the British orders in council, the French decrees; and the consequent acts of the United States' government, has been subjoined.

1816.

The
Edward.

On the 16th of May, 1806, the British government issued an order in council, declaring the coast included between the Elbe and Brest in a state of blockade.

On the 21st of November, 1806, the French emperor issued his Berlin decree, declaring Great Britain and her dependencies in a state of blockade.

On the 7th of January, 1807, the British government issued an order in council, prohibiting neutral ships from carrying on trade from one enemy's port to another, including France and her allies.

On the 11th of November, 1807, the British orders in council were issued, which declared the continental ports from which British ships were excluded in a state of blockade, (except in case of ships cleared out from Great Britain whose cargoes had paid a transit duty,) and rendered liable to condemnation all neutral ships, with their cargoes, trading to or from the ports of France, or her allies, and their dependencies, or having on board certificates of origin.

On the 7th of December, 1807, the French emperor issued his Milan decree, declaring that any neutral ships which should have touched at a British port, or paid a transit duty to the British government, or submitted to be searched by British cruizers, should be liable to condemnation.

On the 22d of December, 1807, the American embargo took place.

On the 1st of March, 1809, the embargo was removed, and a non-intercourse substituted with both France and England.

On the 19th of April, 1809, a negotiation was concluded by Mr. Erskine, in consequence of which the trade with Great Britain was renewed on the 10th of June.

On the 26th of April, 1809, a British order in council was issued, modifying the former blockade, which was henceforth to be confined to ports under the governments of Holland (as far north as the river Ems) and France, together with the colonies of both, and all ports of Italy included between Orbitello and Pesaro.

On the 10th of August, 1809, the non-intercourse with Great Britain again took place, in consequence of Mr. Erskine's arrangement not being ratified.

On the 1st of May, 1810, the trade with both Great Britain and France was opened, under a law of congress, that whenever either power should rescind its orders or decrees, the president should issue a proclamation to that effect; and in case the other party should not, within three months, equally withdraw its orders or decrees, that the *non-importation act* should go into effect with respect to that power.

On the 2d of November, 1810, the president issued his proclamation, declaring the Berlin and Milan decrees to be so far with-

drawn, as no longer to affect the neutral rights of America; and the orders in council not being rescinded,

On the 2d of February, 1811, the importation of British goods, and the admission of British ships into America, were prohibited.

On the 4th of April, 1812, an embargo was laid in the United States, and on the 18th of June following, war was declared against Great Britain.