In re MARINE HARBOR PROPERTIES, Inc.

No. 107.

Circuit Court of Appeals, Second Circuit.

Argued Oct. 20, 1941.

Decided Jan. 10, 1942.

Writ of Certiorari Granted March 16, 1942.

See 62 S.Ct. 907, 86 L.Ed. ——.

---

[3] Grimsley v. United States, 5 Cir., 50 F.2d 509, 511.

FRANK, Circuit Judge, dissenting.

Hughes, Hubbard & Ewing, of New York City (Curtiss E. Frank and Orville H. Schell, Jr., both of New York City, of counsel), for appellant.

Friedland & Friedland, of New York City, for debtor-appellee.

George Rosling, of Brooklyn, N. Y., for receiver-appellee Mortimer Rubenstein.

Chester T. Lane, Gen. Counsel, of Washington, D. C., and J. Anthony Panuch, of New York City (George Zolotar and Mortimer Weinbach, both of New York City, of counsel), for Securities and Exchange Commission.

Before SWAN, CHASE, and FRANK, Circuit Judges.

SWAN, Circuit Judge.

On September 17, 1941 the debtor obtained an ex parte order approving as properly filed under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., its petition for reorganization. The Mortgage Corporation of New York, as trustee for mortgage certificate holders, forthwith applied to the district court to vacate its order of approval and to dismiss the debtor's petition as lacking the good faith required by section 141, 11 U.S.C.A. § 541. After a hearing upon supporting and opposing affidavits, the court denied the application. This order is before us on appeal by Manufacturers Trust Company, the successor by merger of The Mortgage Corporation of New York. The Securities and Exchange Commission filed its appearance in the district court pursuant to section 208, 11 U.S.C.A. § 608, and has presented in this court a brief and argument in support of the order.

So far as relevant to the present controversy section 146 of the Act, 11 U.S.C.A. § 546, provides that

"Without limiting the generality of the meaning of the term 'good faith', a petition shall be deemed not to be filed in good faith if—

\*   \*   \*   \*   \*

"(3) it is unreasonable to expect that a plan of reorganization can be effected; or

"(4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding."

Each of these clauses, the appellant contends, requires dismissal of the debtor's petition.

The debtor's sole asset is an apartment building in Brooklyn of the value, including the land, of not more than $350,000. The premises are subject to a first mortgage in the principal amount of $370,000, with arrears of interest and taxes which bring the indebtedness secured thereby to approximately $400,000 as of October 1, 1941. There is also a second mortgage for $25,000, a third and fourth mortgage for $2,000 each, a balance of $3,000 due on equipment purchased on conditional bills of sale, and unsecured indebtedness in an amount not specified. The first mortgage was made in 1931 by a predecessor in title of the debtor to Title Guarantee & Trust Company, which issued and sold to the public participation certificates therein guar-

anteed by Bond & Mortgage Guarantee Company, hereafter called the guarantor. In August 1933 the guarantor was taken over by the Superintendent of Insurance of the State of New York for rehabilitation under the Schackno Act, N.Y.Laws 1933, Ch. 745, McK.Unconsol.Laws, § 1796 et seq. In this proceeding a plan of reorganization of the rights of certificate holders in the said first mortgage was approved by the Supreme Court of Kings County on December 6, 1934, with the approval of two-thirds of the certificate holders and with the consent of the debtor. Under this plan the mortgage was extended to December 1, 1937 and interest was reduced from 6% to 5%. Subsequently, by order of December 6, 1938 the state court modified the plan to the extent of appointing The Mortgage Corporation of New York as trustee of the bond and mortgage under an approved form of declaration of trust. This order provided that the court should retain jurisdiction until complete liquidation of the trust estate, and that "the trustee, or any other interested party herein" might apply for other and further relief. After the mortgage matured on December 1, 1937 the debtor continued to pay interest and taxes until April 1, 1941. On that date it defaulted, although the earnings of the property were sufficient to cover interest and taxes. Shortly thereafter foreclosure proceedings were begun and the receiver appointed therein has been in continuous possession of the mortgaged premises since May 6, 1941. The appellant and its predecessor trustee have conducted negotiations with the debtor with regard to a further extension and modification of the mortgage but no agreement was reached and no proposed modification was presented to the certificate holders or to the state court. On September 17, 1941 the debtor filed in the district court its petition for reorganization under Chapter X of the Bankruptcy Act.

Since the amount owing under the first mortgage is largely in excess of the value of the premises, it is apparent that no equity remains for junior lienors, unsecured creditors or stockholders of the debtor. The appellant, therefore, argues that it is unreasonable to expect that a plan of reorganization can be effected, and that section 146(3) of the Act, 11 U.S.C.A. § 546 (3), requires dismissal of the debtor's petition. But as the Supreme Court stated in Case v. Los Angeles Lumber Co., 308 U.S. 106, 131, 60 S.Ct. 1, 84 L.Ed. 110, approval of a debtor's petition is no indication that its stockholders will participate in the plan. Nor is the fact of insolvency sufficient to prove that the petition was filed in bad faith. In re Castle Beach Apartments, 2 Cir., 113 F.2d 762; In re Central Funding Corp., 2 Cir., 75 F.2d 256, 261; In re Julius Roehrs Co., 3 Cir., 115 F.2d 723, 724. And this is further demonstrated by section 179, 11 U.S.C.A. § 579, where the implication is clear that a plan may be effected, even though the debtor has been found to be insolvent. It is true that when the first mortgage security is inadequate and the debtor has no assets other than the mortgaged premises, it is difficult to conceive of a plan, which the court could approve as fair and equitable, that would give anything to lienors or creditors other than the first mortgage certificate holders, unless new money is put in. But even if it be unreasonable to expect that new money will be forthcoming or that any plan can be effected which will provide anything for the debtor or its shareholders, we do not think clause 3 of section 146, 11 U.S.C.A. § 546(3), requires dismissal of the debtor's petition; the reorganization may still go on in the interest of such creditors as shall be found entitled to share in the debtor's assets. No plan was, or could be, submitted by the debtor with its petition, and we see no error in the district judge's conclusion that the trustees in reorganization should have an opportunity to explore the possibilities and propose a plan before he should decide that it was unreasonable to expect that any reorganization could be effected. Cf. In re Blinrig Realty Corp., 2 Cir., 114 F.2d 100.

The second branch of the appellant's argument presents the contention that the pending state court reorganization proceedings require dismissal of the debtor's petition pursuant to section 146(4), 11 U. S.C.A. § 546(4). Primary reliance is placed on the recent decision of this court in Brooklyn Trust Co. v. Rembaugh, 2 Cir., 110 F.2d 838. In the Rembaugh case a finding of good faith was reversed on facts closely parallel to those of the case at bar. There are, however, slight differences which the debtor seizes upon as a ground for distinction. In Rembaugh, the plan of reorganization, as promulgated in the state court, provided in the same order for appointment of a trustee and for extension of the mortgage, and the mortgage had not matured when the debtor defaulted and foreclosure was commenced. Therefore, it

is urged, the state proceeding was still pending when the debtor's petition was filed, while that is not the situation in the case at bar. With the latter conclusion we cannot agree. It is true that the original plan of reorganization provided only for an extension of the mortgage to December 1, 1937, but the 1938 proceeding in which a trustee was appointed was denominated a "modification" of the original plan and the court expressly reserved jurisdiction to grant other relief on the application of any "interested party." The debtor had consented in open court to the original plan, had not objected to the modification, and had made payments to the trustee in conformity with it for more than two years. We think the debtor had assented to the modified plan as fully as had the debtor in the Rembaugh case. The two cases cannot be distinguished on this ground. The district court, 41 F.Supp. 814, 816, attempted to distinguish them on the ground that "here the debtor has endeavored on two occasions to present modified plans for relief, but on each occasion, has been rebuffed by the trustee" and given no opportunity to communicate with the certificate holders. But the debtor made no attempt to bring its proposals to the attention of the state court in the pending proceeding, as we think it was entitled to do as an "interested party"; had it done so its proposals, with the court's approval, could have been presented to the certificate holders. That proceeding provides adequate means to reorganize the mortgage and protect the rights of all certificate holders whose interests alone exhaust the debtor's property. In the Rembaugh case we held the element of good faith to be lacking because a debtor, which had voluntarily submitted to a plan for reorganization in the state court but found compliance therewith irksome, invoked federal jurisdiction instead of seeking relief in the state court. Although the debtor did not itself propose a plan, it assented to one proposed by another and was, we said, "in the position of one who voluntarily submitted the plan for the reorganization in the state court" [110 F.2d 840]; and the opinion enunciated the following rule: "After electing to have the mortgage provisions modified in the state court proceedings it could not escape from the consequences of the plan to which it had assented by simply filing a petition for re-

organization in the federal court while the proceedings in the state court were still pending." Unless we are to overrule the Rembaugh case, we think the same decision must be made here.

■ A majority of the court is of the opinion that the Rembaugh case should be given effect here to prevent a debtor, who has assented to a plan which is being supervised by the state court in reorganization proceedings still pending there, from flouting that jurisdiction by filing a petition in the district court. The applicable principle, as was said in the Rembaugh case, is not an absence of good faith in the filing of the new petition in the broad meaning of those words but a special instance of a lack of good faith flowing from the personal disqualification of the debtor. Section 146, 11 U.S.C.A. § 546, expressly disclaims any limitation upon the generality of the meaning of good faith and subsection 4 of that section is but one special instance of what will show a disabling absence of it on the part of a debtor and is not to be confused with what controls here. Nor is it relevant that others than the debtor may have the right to file a petition in the district court regardless of the pendency of a petition in some other court or what the debtor has done there. Until such a petition has been filed, the jurisdiction of the court has been invoked only by the debtor's petition and properly invoked only if the petition has been filed in good faith. Section 141, 11 U.S.C.A. § 541.

Accordingly, the order is reversed.

FRANK, Circuit Judge (dissenting).

My colleagues base their decision, requiring dismissal of the petition, on Section 146(4) as they consider it to have been interpreted in the earlier decision of this court in Brooklyn Trust Co. v. Rembaugh, 2 Cir., 110 F.2d 838. That decision has been severely criticized. See 18 N.Y.U.L. Q.Rev. (1941) 399, 418; cf. 412–443.

I am wholly in accord with the general policy of adherence to rulings in earlier decisions. But there are well recognized exceptions to that policy, and I think that the instant case comes squarely within those exceptions. Undeniably, in order to achieve impartial administration of justice, "equality before the law," and legal certainty, as far as is practicable, [1] it is im-

---

1 As to how far it is practicable to procure such certainty through stare decisis,

° see, e.g., Wigmore, The Judicial Function, in The Science of Legal Method,

portant, generally, that a court should not deviate, except prospectively,[2] from its own decision in a prior case, even if that decision was in error, especially where such deviation will harm persons who acted in reliance upon that decision—as, for instance, a decision assigning specific legal consequences to specific words in a deed or lease. But that policy loses its force when there has been no such reliance; the question relates solely to procedure; it is plain, on reconsideration in a subsequent case, that the decision in the prior case involved an interpretation of a statute which defeats an important purpose of the legislature, and such interpretation arose from a failure of the court in the prior case to consider matters not called to its attention by the parties.

In Webster v. Fall, 266 U.S. 507, 511, 45 S. Ct. 148, 149, 69 L.Ed. 411, the court said: "Counsel for appellant directs our attention to other cases, where this court proceeded to determine the merits notwithstanding the suits were brought against inferior or subordinate officials without joining the superior. We do not stop to inquire whether all or any of them can be differentiated from the case now under consideration, since in none of them was the point here at issue suggested or decided. The most that can be said is that the point was in the cases if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents. See New v. Oklahoma, 195 U.S. 252, 256, 25 S.Ct. 68, 49 L.Ed. 182; Tefft,

Weller & Co. v. Munsuri, 222 U.S. 114, 119, 32 S.Ct. 67, 56 L.Ed. 118; United States v. More, 3 Cranch 159, 172, 2 L.Ed. 397; The Edward, 1 Wheat. 261, 275, 276, 4 L.Ed. 86." Cf. Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 486, 43 S.Ct. 597, 67 L. Ed. 1078. In Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, the Supreme Court in 1938 overruled a statutory interpretation which it had frequently applied over a period of ninety-six years.[3]

In the Rembaugh case, briefs were filed by the debtor and by the trustee, appointed in the state court proceeding. No certificate-holder appeared.[4] Indeed, the state court trustee asserted in its brief in that case that it alone could be heard to speak for the certificate-holders.[5] Without at all suggesting any lack of integrity on the part of that state court trustee, it is appropriate to observe that it had a selfish interest, not identical with the interests of the certificate-holders, in having the state court proceeding continue, because the trustee derived emoluments therefrom which would terminate if the Chapter X proceeding was not dismissed.[6] As a result, important considerations affecting the interests of the certificate-holders were not pressed, and the case was argued as if the major factors were the prior conduct of the debtor (regarded as giving rise to some kind of an estoppel), and the protection of the debtor's interests. Consequently, this court, on the basis of such limited argument, said nothing whatever in its opinion in the Rembaugh case as to the purpose and effect of those provisions of Section 146(4)

xxxvi–xxxix; Wigmore, Problems of Law, 79–80; Dillon, The Laws and Jurisprudence of England and America, 242 ff; Dickinson, Administrative Justice and The Supremacy of Law, 210, 231–232; Kessler, Theoretic Bases of Law, 9 Un. of Chic.L.Rev. (1941) 98, 107; Green, Judge and Jury, 79–80.

[2] As to prospective overruling of precedents, see Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 365, 366, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254; People v. Maughs, 149 Cal. 253, 86 P. 187; People v. Ryan, 152 Cal. 364, 92 P. 853; cf. Cardozo, The Nature of the Judicial Process, 146-149; Wigmore, loc. cit.

[3] See Burnet v. Coronada Oil & Gas Co., 285 U.S. 393, 406, note 1, 52 S.Ct. 443, 447, 76 L.Ed. 815, for a list of cases in which the Supreme Court had previously overruled its prior decisions. There

have been other such cases, since Erie R. Co. v. Tompkins; among them are Nye v. United States, 1941, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172; California v. Thompson, 1941, 313 U.S. 109, 116, 61 S.Ct. 930, 85 L.Ed. 1219; Olsen v. Nebraska, 1941, 313 U.S. 236, 237, 61 S. Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500.

[4] As the Chapter X proceeding never went beyond the filing of the petition, presumably no notice was given to certificate-holders.

[5] The trustee went so far as to maintain in its brief that if the Chapter X proceeding continued, it alone, and no certificate-holder, could vote on a plan proposed therein.

[6] A brief, amicus curiae, was filed by trustees appointed in other state court proceedings. Of course, they too had such an interest in the continuance of their emoluments.

which explicitly refer to the protection of the interests of creditors. Those provisions have, in the instant case, been called to our attention by the S. E. C., which is a party here, as it was not in the Rembaugh case. And, as no one who acted in reliance on the decision in that case will be harmed by our failure here to regard it as a binding precedent, we should disregard it, since, if we do not do so, we will, as I shall try to show, be frustrating important objectives of Congress in enacting Chapter X.

Here no "rule of property" is involved. Peculiarly in such a case as this, it is appropriate to bear in mind that "stare decisis, in statutory construction, is a useful rule, not an inexorable command," [7] and that, although it is a doctrine "tending to consistency and uniformity of decision," it "is not inflexible." [8] It has been well said that, although "inconsistent decisions rendered in disregard of the principle of stare decisis tend to make the law uncertain and unstable," and a court "may hesitate to disregard a precedent," nevertheless "it is free to do so when convinced that its earlier determination is unsound." [9] "Mere precedent, alone, is not sufficient to settle and establish, forever, a legal principle. Infallibility is to be conceded to no human tribunal." [10] While uniformity is important, "we must not allow a Blackstonian optimism to blind us to remediable defects * * * Above all, we must not assign to precedent a sacramental magic in opposition to the principles of logic and justice." [11] It is not the duty of courts, in all circumstances, to perpetuate their errors.

The majority opinion recognizes that it is not at all necessary in order to avoid dismissal of a petition pursuant to Section 146(3), to show that "it is unreasonable to expect that a plan of reorganization be effected," in which the debtor or its stockholders will participate. In the instant case, for instance, where, as the majority opinion states, the claims of the certificate-holders exhaust the debtor's property and no equity remains for the stockholders, there is no

reason why (unless the stockholders furnish needed new money or other needed new consideration) a plan cannot be effected by which, without the expense or delay involved in foreclosure, the property will promptly be turned over to a new company, having no debts, all of the stock being ratably distributed among the certificate-holders. That some such plan [12] can reasonably be expected to be effected under Chapter X is, we all agree, sufficient to prevent a dismissal pursuant to Clause (3).

But the majority opinion follows the Rembaugh case in holding that the controlling factor is the earlier conduct of the debtor in the pending state court proceedings. Such an interpretation of Clause (4) as was employed in that case disregards its plain language. By its express terms, Clause (4) calls for a dismissal of a petition when "a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding." Clearly, it should be alone sufficient, to prevent dismissal, under (4), that "the interests of creditors" will not be best subserved in the prior proceeding. And particularly is that true when, as here, the claims of the creditors exceed the value of the assets, so that there is small likelihood that the stockholders will have any interests.

But in the Rembaugh case, the court acted as if Clause (4) provided for dismissal "if it appears that the interests of the stockholders alone will be as well subserved in the prior proceedings; if that appears, then no consideration shall be given to the question whether the interests of the creditors will be best subserved in such proceeding." The majority opinion here, in effect, accepts that interpretation. It says that "the debtor had assented to the modified plan as fully as had the debtor in the Rembaugh case"; and that "the debtor made no attempt to bring its proposals to the attention of the state court"; that "in the Rembaugh case we held the

[7] Mr. Justice Reed in Erie R. Co. v. Tompkins, 304 U.S. 64, 92, 58 S.Ct. 817, 828, 82 L.Ed. 1188, 114 A.L.R. 1487.

[8] Hertz v. Woodman, 218 U.S. 205, 212, 30 S.Ct. 621, 622, 54 L.Ed. 1001.

[9] Sears, Roebuck & Co. v. 9 Ave.–31 St. Corp., 274 N.Y. 388, 400, 9 N.E.2d 20, 26.

[10] Leavitt v. Morrow, 6 Ohio St. 71, 78, 67 Am.Dec. 334.

[11] Allen, Law in the Making (1927) 188.

[12] On the all-common-stock plan, see Matter of Flour Mills of America, Inc., 7 S.E.C. 1, 27. In the instant case, such a plan might, in the alternative, provide for a relatively small amount of new debt, and all the debt obligations and stock might be distributed among the certificate-holders.

element of good faith to be lacking because a debtor, which had voluntarily submitted to a plan for reorganization in the state court but found compliance therewith irksome, invoked federal jurisdiction instead of seeking relief in the state court."

But why should such conduct of the debtor preclude careful scrutiny by the federal court of what is best for creditors, especially in this case where the majority finds that the interests of the creditors "alone exhaust the debtor's property"? Why, in such a case, should attention be confined solely to the conduct of the debtor and the interests of its stockholders? In any sort of case, the interests of creditors should be given precedence over those of stockholders. But in a case like this, it is especially strange to ignore the best interests of the creditors (the certificate-holders) and to order dismissal, either because of some sort of estoppel of the debtor or because its interest (not that of the creditors) can be as well subserved in the prior proceeding.

The Rembaugh interpretation of Clause (4), adopted by the majority here, in effect reads out of the statute the words "the interests of the creditors." And in doing so, it defeats a major purpose of Congress in substituting Chapter X for former Section 77B, 11 U.S.C.A. § 207. Here we reach the basic error in the Rembaugh decision:

The elaborate studies of the S. E. C., and of the congressional committees, which led to the enactment of Chapter X demonstrated that plans had theretofore frequently been adopted in state court proceedings, and even under Section 77B, which were not "fair and equitable" or which, although "fair and equitable," were not "feasible." For present purposes, it will suffice to consider the way in which the criterion of "feasibility" is applied under Chapter X.

A plan may limit participation to those equitably entitled to participation and provide for distribution of the new securities according to the priorities of such participants in the old enterprise; it is, then, "fair and equitable." But study disclosed that, under many such a plan, there was set up a new enterprise with such an excessive amount of new debt obligations that new defaults soon occurred, compelling a new reorganization in a short time.[13] Such a plan is not "feasible." Because Congress found that plans lacking feasibility had frequently been adopted but were undesirable, it expressly ruled them out. And one of the principal purposes of Chapter X, in providing for advisory reports by the S. E. C., was to see to it that the district court will be properly informed, before approving a plan for submission to the old security-holders, as to whether the plan is "feasible." Experience under Chapter X has shown that the district courts, on the basis of such S. E. C. advisory reports, have rejected many plans, or caused them to be modified, because of lack of "feasibility."

Consequently, before dismissing a petition under Section 146(4) because a prior proceeding is pending, the district court, in deciding whether "the interests of creditors * * * would be best subserved in such prior proceeding," must consider, among other things, whether, in the pending state court proceedings, there are safeguards, at least equivalent to those afforded by Chapter X, to ensure that a plan adopted in the state court proceeding will be not only "fair and equitable" but also "feasible." If the district court finds, for instance, that the value of the property is so small that creditors alone can participate, and that there is only one class of creditors entitled to participation, it must then, before dismissing a petition under Section 146(4), ask and answer this question: Are there safeguards, at least as good as those under Chapter X, to ensure that a plan adopted in the state court—even if it is sure to allocate all the new securities to those creditors—will be so devised as to meet the test of feasibility? It must consider, for instance, whether there are methods, sure to operate in the state court, and as adequate as those under Chapter X, for ascertaining whether it is feasible to issue any new debt obligations, and, if so, what is feasible as to the principal amount

---

[13] There are other factors which may render a plan not "feasible." For instance, a plan may call for the issuance of preferred stock with cumulative dividends which cannot be expected to be earned. On feasibility generally, see Note (1941), 18 New York Un. Law Q. Rev. 399, 466. Among the standards applied is the requirement of a capital structure consistent with expected future income [Matter of San Francisco Bay Toll-Bridge Co., 6 S.E.C. 863, 867 (1940); cf. 51 Yale Law J. 85, 91, 96] and of a workable capital structure (S.E.C. Report on Protective and Reorganization Committees, Part VIII, 159-161).

of such obligations and as to the rate of interest.

It may perhaps be said that· such an interpretation of Section 146(4) means that no petition will ever be dismissed thereunder, i. e., that such an interpretation renders Clause (4) functionless. But that is not true. A case can easily arise where, before the Chapter X petition was filed, a plan had been proposed in the pending state court proceedings, and where the district court[14] finds that that state court plan is both "fair and equitable," and "feasible," and that the parties will be protected by safeguards substantially equivalent to those of Chapter X.[15] In such a case, the petition should be dismissed under Clause (4). If, in the instant case, some such plan had been proposed in the state court before the petition was filed, and the district court could thus have satisfied itself as to the protection of the interests of the certificate-holders, and had done so, then a dismissal would have been proper under Clause (4).[16]

But that is not this case. Here the "plan" approved by the state court in December, 1934, as modified in December, 1938, merely provided for an extension of the mortgage and retention of jurisdiction by the state court until complete liquidation. The debtor subsequently defaulted in payment of interest on April 1, 1941; foreclosure proceedings have been begun in the state court; a state court receiver is in possession; and unsuccessful negotiations for further extension and modification of the mortgage have been conducted. If, then, there is not to be liquidation, a new plan must be adopted. And no such new plan had been brought forward in the pending state court proceedings, before the petition was filed under Chapter X, nor do we know of any which has, since then, been proposed.

My colleagues say, and I agree, that the district judge correctly concluded that, so far as Clause (3) is concerned, trustees in reorganization under Chapter X "should have an opportunity to explore the possibilities and propose a plan before he should decide that it was unreasonable to expect that any reorganization could be affected." But my colleagues, out of deference to the Rembaugh decision, have decided that, nevertheless, there must be a dismissal solely because of the debtor's conduct in the prior and pending proceeding.

True, in so deciding, they say that that prior proceeding "provides adequate means to reorganize the mortgage and protect the rights of all certificate-holders whose interests alone exhaust the debtor's property." But that single reference in their opinion to the protection of the interests of certificate-holders, they support by nothing whatever; there is no demonstration that those interests will be "best subserved" in that proceeding, i. e., that there will be safeguards for their interests equivalent to those provided by Chapter X.

Appellant argues that such protection will be afforded in the state court proceedings, and it points particularly to the function of the Bureau of Trust Supervision in advising the state court as to the fairness of proposed plans. But proof that protection will be provided requires far more than a mere reference to the statute establishing this agency. Absent a more convincing showing, it is impossible for me to concur in a decision dismissing the petition under Section 146(4).

There remains to be considered the suggestion of my colleagues that, quite apart from Clause (4), the conduct of the debtor

---

[14] It would seem appropriate that it obtain an advisory report from the S.E.C. as an aid to making its determination.

[15] One of the important new safeguards of Chapter X is that, in certain kinds of cases, (1) the court must receive an S.E.C. advisory report and must thereafter find the plan fair and equitable and feasible before the plan is submitted to those interested in the estate, and (2) those voting on the plan must, before voting, have in their hands that advisory report. It may well be, therefore, that, in the supposititious case discussed in the text, the district court not only should, before its dismissal of the petition, find the state court plan fair and equitable and feasible, but should condition its dismissal on the distribution to the creditors, before they vote on the plan, of the S.E.C. advisory report. On the public interest in stable investments, see Matter of San Francisco Toll-Bridge Co., 6 S. E.C. 863, 867, 872. On the importance of the advice of an expert impartial agency as to the issue of valuation, see 51 Yale Law J. 85, 93.

[16] No doubt there might be other situations in which the court might appropriately find that the interests of creditors and stockholders would be best subserved by continuation of the state proceeding.

in the state court demonstrates that the petition was not "filed in good faith," and that such considerations must be regarded because Section 146 begins with the words "Without limiting the generality of the meaning of the term 'good faith' * * *" To such a suggestion, there are, I think, these answers:

My colleagues rest their decision here on the Rembaugh case. But in that case this court rejected the argument which my colleagues now advance, saying that there was no "substantial ground for attacking the exercise by the trial judge of discretion to approve the petition as one filed in good faith within the broad meaning of that term." More important is the fact that Congress in Clause (4) explicitly covered the subject of what effect should be given to "a prior proceeding * * * pending in any court." It said that, when there was such a proceeding, then "good faith" was to be tested by the criterion, already discussed, of whether the interests of creditors and stockholders would be best subserved therein. To set up other tests of "good faith," concerning such prior proceedings, is, therefore, to enlarge on a subject with which Congress exhaustively dealt in Clause (4). Nothing in the legislative history of the statute justifies such a departure from its language. And the courts should hesitate thus to depart from that language when, as here, to do so means that, realistically considered, the best interests of creditors—which Congress clearly regarded as of major importance in determining whether a prior proceeding should be the basis of dismissal—will be injured. Anyone familiar with the realities of corporate reorganizations—as Congress was when it enacted Chapter X after the elaborate studies of that subject by the S. E. C. and the Congressional Committees—knows that scattered individual security-holders, such as the individual certificate-holders in this case, are not at all informed as to their rights. It is true that, under Section 126, three such certificate-holders, having claims aggregating at least $5,000, can file a petition for reorganization under Chapter X, notwithstanding the pendency of state court proceedings. But, ignorant of their theoretical rights, as most such security-hold-

ers are, they seldom exercise them, but, instead, usually go along with whatever proceedings have already been instituted. It is the well-known inertia of such security-holders which led to the enactment of many of the provisions of Chapter X. Consequently it is impossible to believe that Congress intended that, once a petition under Chapter X has been filed by a debtor, the federal court should dismiss it, because of the prior conduct of the debtor in a pending state court proceeding, without regard to whether the interests of the creditors will be as well protected in such prior proceeding—merely on the ground that, if the creditors so desire, they later can themselves, independently, file a petition under Chapter X. Under the reasoning of the majority opinion, the present petition, filed by the debtor, will be dismissed without regard to the interests of the certificate-holders, but if, the next day, three certificate-holders, with claims of $5,000, should be alert enough to file a petition, then the district court would be obliged to refuse a dismissal because then it would be required to consider the best interests of the creditors and to ignore the prior conduct of the debtor in the state court proceedings. Surely now that a petition has been filed, although filed by the debtor, the same considerations should apply as if creditors had filed it.

The history of the concept of "good faith" has an important bearing on the interpretation of those words in Section 246:

(a) That concept had its origin in the reaction to "friendly" equity receiverships, sometimes used by debtors in conjunction with certain of their creditors, to bring about reorganizations often improperly favorable to the debtor or its management at the expense of other creditors. At a period when the reorganization aspects of such receiverships were still considered not the concern of the courts, and when they still confined their attention solely to the formal aspects of the proceedings,[17] such "collusive" methods of initiating the proceedings were condoned.[18] But Northern Pacific Ry. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, ushered in an era, in which the courts exercised jurisdiction to pass upon the fairness and equity of the reorganization plans which were the true ob-

---

[17] Cf. Cravath, Reorganization of Corporations, in Some Legal Phases of Corporate Financing and Regulation (1917) 153, 190–191; Conley v. International Pump Co., D.C.S.D.N.Y.1915, 237 F. 286, 287.

[18] Re Metropolitan Railway Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403.

jectives of such receiverships. As a result, there later developed a condemnation of the "friendly" or "collusively" begun receivership and a renewed emphasis on the notion that the receiver must be independent, not a representative of the debtor or any class of creditors, but the eyes and ears of the court. Cf. Harkin v. Brundage, 1927, 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457; Shapiro v. Wilgus, 1932, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128; First Natl. Bk. v. Flershem, 1933, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 39.

The increased awareness that the reorganization was the core of such proceedings, led to the enactment of Section 77B, which created a judicial procedure fashioned expressly for the purpose of reorganization, recognizing squarely that the fairness, equity and feasibility of the plan were matters directly for the court's consideration. Unfortunately, however, in one important respect, Section 77B marked a retrogression from the equity receivership practice: It permitted the debtor to be continued in possession; and it imposed no standards with respect to the disinterestedness of the trustee, in the event that one was appointed. As a result, in actual practice, in many, if not most, cases, the persons in possession of the property were members of the old management. Moreover, consents to a plan under Section 77B had to be obtained before the plan could be brought before the court for confirmation. This put pressure on the judge not to undo the efforts expended in procuring such consents —often obtained by the old management or those friendly to it and frequently before the proceedings in court were begun—so as to induce the judge to regard consents given by a large percentage of the creditors as substantial evidence of the fairness of the plan and its feasibility. Not until 1939, after Section 77B had been repealed, did the Supreme Court, in Case v. Los Angeles Lumber Co., Ltd., 308 U.S. 106, 114, 115, 60 S.Ct. 1, 84 L.Ed. 110, hold that such a criterion under that section was improper. Meanwhile, many courts had approved plans (on the assumption that a fair plan was to be merely a sort of bargain) [19] which, measured by the rules later laid down in Case v. Los Angeles Lumber Co., supra, were unduly beneficial to the debtor

and unfair to some of its creditors. While that attitude maintained, the intention and motivations of the persons who instituted Section 77B proceedings were still of considerable importance—of even greater importance, indeed, than under the more recent equity receivership procedure where, at least, the receiver was sure to be disinterested and where the debtor could not remain in possession, so that the power of the old management to play a role in the formulation of the plan was likely to be less than under Section 77B. The original concept of "good faith" in the initiation of the proceeding, therefore, justifiably remained dominant under Section 77B.

The defects in the Section 77B procedures, above noted, were among the principal reasons for the repeal of that section and the enactment, as a substitute, in 1938, of the provisions of Chapter X. Those provisions eliminated the possibility of consummating plans improperly devised in the interest of the debtor of any special group of creditors. For, once the court takes jurisdiction under Chapter X, the proceeding ceases to be under the control of the petitioners or the debtor; it is conducted by a disinterested trustee—who must prepare a plan or report why one cannot be effected— under the constant surveillance by the court, usually assisted by the S. E. C.; and no acceptances of any plan, conditional or unconditional, may, without the consent of the court, be solicited until after the entry of an order approving the plan.

The consequence is that even if a Chapter X petition is filed with an improper intent to bring about a plan lacking in fairness to all the creditors or in feasibility, that improper intent can no longer be realized. Therefore, the existence of such an intent on the part of any petitioner—whether the debtor or anyone else—has become utterly irrelevant under Chapter X. "Good faith" does not have an inflexible meaning regardless of context. The original concept of "good faith," meaningful in the equity receivership and Section 77B cases, has, accordingly, become meaningless under Chapter X.[19a] To import that concept—designed to prevent harm to creditors resulting from proceedings begun with an improper or "collusive" purpose—into Chapter X, where such harm is now impossible, so

---

[19] E.g., In re A. C. Hotel Co., 7 Cir., 1937, 93 F.2d 841; Downtown Investment Ass'n v. Boston Metropolitan Buildings, 1 Cir., 1936, 81 F.2d 314.

[19a] Cf. Snyder v. Fenner, 3 Cir., 101 F.2d 736.

as to compel a dismissal of a Chapter X proceeding solely because of some improper purpose on the part of the debtor or other petitioner, is, paradoxically, to do harm to the creditors through the denial to them of the benefits of a sound and equitable reorganization.[20]

Section 246 must be read in the light of Section 256: The latter section provides that prior proceedings may be superseded regardless of the length of time in which they have been pending. The mere pendency of such prior proceedings, consequently, creates no presumption of any lack of "good faith" in the filing of a Chapter X petition. And, in this connection, we should not ignore this fact: There is the possibility that, to the detriment of creditors, the prior proceeding "may have been resorted to for the purpose of avoiding the protective devices and stringent standards of Chapter X. It is believed that since the enactment of Chapter X, there has been a substantial increase in the use of state rehabilitation procedures formerly thought to be less desirable and efficient than bankruptcy reorganization procedures."[21] Such state proceedings, it is suggested,[21a] have been utilized, to avoid the safeguards of, and supervision under, Chapter X, just as—until the Supreme Court intervened to stop that practice in Securities and Exchange Comm. v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 [22]—Chapter XI proceedings were similarly being employed.

Let us assume, arguendo, that, in the instant case, the state court proceeding was begun and had been acquiesced in by the debtor for the purpose of avoiding the Chapter X safeguards, but that the debtor, subsequently—but, of course, mistakenly—believing that it would fare better under Chapter X, filed the Chapter X proceeding now before us. There would then be a lack of "good faith," in a colloquial sense, on the part of the debtor. But that bad faith of the debtor in instituting the Chapter X proceeding should surely not operate to take away from the creditors the benefits which they will receive under Chapter X of which,

on our assumption, the prior proceeding was designed to deprive them. Indeed, the more the bad faith of the debtor and those confederating with it in such circumstances, the more reason the bankruptcy court should take jurisdiction.

There is, then, much merit in the suggestion that such a situation as existed in the Rembaugh case and as exists here "would seem to call for the remedies offered by Chapter X," and that "the interests of the security-holders in a successful and needed rehabilitation should be deemed superior to the possibly questionable motives of the debtor."[23]

It should be added that there is no justification for ascribing any unfair motives to the debtor in the instant case. It may have some hopes of supplying new cash so as to permit it or its stockholders to participate in a plan; or it may be desirous of bringing about a plan, fair to its creditors and feasible, in which it will not participate.

For reasons similar to those noted above, it seems plain to me that the doctrine of "election of remedies," intimated in the Rembaugh opinion, and by the majority here, should be given no weight. That harsh doctrine is fast becoming weaker even in its traditional strongholds,[24] and I cannot acquiesce in the attempt to import it into the streamlined procedure of the Chandler Act. A Chapter X procedure is not a piece of litigation in which the debtor is one of the contending parties, a lawsuit in which it seeks relief against someone else. As Judge Lindley said of an equity receivership reorganization proceeding, it "is of necessity largely administrative" and requires "the exercise of administrative jurisdiction, as distinguished from decision of controverted or litigated questions."[25] The debtor filing such a petition is not a plaintiff commencing an action; if the court takes jurisdiction, an administrative proceeding ensues in which the estate is administered by an independent trustee under the court's supervision. "Election of remedies" is a doctrine wholly alien to such non-litigious atmosphere.

[20] Cf. 18 N.Y.U.L.Q.Rev. (1941) 399, 415.

[21] Ibid, 417 and note 161.

[21a] Ibid.

[22] Reversing the decision of this court in Re United States Realty & Improvement Co., 2 Cir., 108 F.2d 794.

[23] N.Y.U.L.Q.Rev. supra, 418.

[24] See Clark, Code Pleading (1928)

335–339; Hine, Election of Remedies, a Criticism (1913) 26 Harv.L.Rev., 707; Comment (1925) 34 Yale L.Rev. 665.

[25] Lincoln Printing Co. v. Middle West Utilities Co., D.C., 6 F.Supp. 663, 682, 683; cf. S.E.C., Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VIII, 1–2.

Even if the doctrine were applicable, I cannot understand why any such election of remedies by the debtor should be determinative of what is for the best interests of the creditors. Again, viewing the situation realistically, it is obvious that the certificate-holders themselves have not, in any real sense, elected in favor of the state court proceeding. They did not select the trustee which now favors the state proceedings, nor can it be realistically said that they have ratified its appointment or actions. The trustee's claim that it can arbitrarily restrict the certificate-holders to the state court proceeding is especially surprising since, so far as appears, the trustee has given them no notice of the present action, and since, in the Chapter X proceeding to which the trustee objects, they will be entitled to notice and a hearing on the appointment of a Chapter X trustee, 11 U.S.C.A. §§ 561, 562, as well as to vote on a proposed plan, 11 U.S.C.A. § 579. And even if it could be said that the certificate-holders had acquiesced in the prior proceeding, nevertheless, no theory of election or estoppel should control since, under Clause (4), the inquiry must be what is for their best interests. That cannot be determined by whether or not they acquiesced in the prior proceedings, since Congress indicated no such factor as a test of what is for their best interests.

For the foregoing reasons, we should affirm the order of the district court refusing to dismiss the petition. At most, we should either (a) direct the district court to vacate its order and dismiss the petition, if, and only if, appellant satisfies the district court that some persons interested in the estate have relied to their detriment on the ruling in the Rembaugh case;[26] or (b) announce that hereafter, absent proof of such reliance, we shall not adhere to that ruling.[27]

[26] See authorities cited in footnote 1.

[27] See authorities cited in footnote 2.